

**United States Department of Justice**
Consumer Protection Branch
450 Fifth Street, N.W., Suite 6400
Washington, D.C. 20001

July 12, 2024

**By Electronic Mail**
The Honorable Gerald J. Pappert
11614 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

Re:     *United States v. AmerisourceBergen, et al.*, Civ. No. 22-5209 (E.D. Pa.)

Dear Judge Pappert,

We write in response to Defendants' June 28, 2024 letter regarding a discovery dispute in the above-captioned matter ("**Def. Letter**"). As explained below, Defendants seek records that are irrelevant to the issues in this case and would be disproportionately burdensome to produce. Thus, the Government respectfully requests that the Court deny Defendants' request for discovery.

## I.     Background

In June of last year, Defendants propounded 102 Requests for the Production of Documents ("**RFPs**") seeking extraordinarily broad discovery. *See* Attachment 1 (Defendants' First Set of RFPs). The RFPs sought, essentially, all Drug Enforcement Administration ("**DEA**") records relating to the suspicious-order-reporting laws (21 C.F.R. § 1301.74(b) and 21 U.S.C. § 832(a)(3)) ("**SORs laws**"), contemplated amendments to the SORs laws, DEA's use of suspicious-order reports, Defendants, Defendants' customers, and much more. The Government responded on August 9, 2023, objecting on grounds including relevance, burden, and privilege, but agreed to produce a substantial volume of relevant documents. Following Defendants' Answer to the Complaint, the parties engaged in several months of negotiations regarding the scope of discovery, during which the Government agreed to search the files of roughly 100 custodians and numerous non-custodial sources, and to produce non-privileged materials relating to Defendants' conduct, DEA's understanding of that conduct, DEA's use of Defendants' suspicious-order reports, and a number of other topics. However, the Government has consistently objected to producing internal DEA documents reflecting DEA employees' non-public thoughts regarding the SORs laws, on grounds of both relevance and privilege.

On May 17, 2024, the Government sent Defendants a letter outlining three categories of non-privileged, internal DEA documents potentially relevant to Defendants' own understanding of the SORs laws (and thus, to their *mens rea* with respect to the alleged reporting violations) that the Government agreed to search for and produce: (1) internal DEA documents that relate to external communications (*e.g.*, DEA documents that reflect or discuss communications between DEA and Defendants or other third parties, such as industry groups); (2) internal DEA documents concerning Defendants and the facts in this case (*e.g.*, internal DEA documents discussing Defendants' suspicious-order-monitoring systems); and (3) internal DEA documents regarding the

The Honorable Gerald J. Pappert
July 12, 2024
Page 2 of 5

interpretation of the SORs laws from specific DEA personnel whom Defendants contend provided them with advice about the SORs laws inconsistent with the Government's legal theory. *See* Def. Letter, Exhibit B (Government's May 17, 2024 Letter to Defendants) at 1–3. With respect to other internal DEA records regarding the SORs laws, the Government's letter explained, citing applicable law, why they were not relevant and largely privileged in any event. *Id.* at 3–5. Rather than respond substantively to the Government, Defendants submitted their letter to the Court.

## II.    Defendants Seek Irrelevant Documents

Under the Federal Rules of Civil Procedure, discovery is limited to "any nonprivileged matter that is ***relevant*** to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b) (emphasis added). Thus, the touchstone for discovery is relevance. The party seeking discovery has the burden to establish the relevance of the material requested. *See, e.g.*, *Bretter v. Peyton*, 2023 WL 3851975, at *1 (E.D. Pa. June 6, 2023) ("When a party moves to compel discovery pursuant to Fed. R. Civ. P. 37, the moving party bears the initial burden of proving the relevance of the material requested[.]"). Defendants erroneously rely on superseded language of Rule 26 to suggest that the information sought need only appear "reasonably calculated to lead to the discovery of admissible evidence." *See* Def. Letter at 3. But that phrase has been removed from Rule 26 because it "has been used by some, incorrectly, to define the scope of discovery." *See* Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.

As an initial matter, it is unclear exactly which documents Defendants now seek to compel, as they have not cited specific RFPs and therefore have not specifically articulated which documents they want produced. As noted above, Defendants propounded over 100 RFPs, and the Government has agreed to produce large volumes of documents responsive to most of those requests. Indeed, the Government has ***already agreed*** to produce some of the categories of documents mentioned in Defendants' letter, such as documents about "DEA's knowledge of Defendants' Suspicious Order Monitoring systems." *See* Def. Letter at 1; Def. Letter, Exhibit B (Government's May 17, 2024 Letter) at 2 (agreeing to produce, *inter alia*, documents responsive to Defendants' RFPs 57–62); Attachment 1 (Defendants' RFPs) at 57–62 (seeking DEA documents regarding Defendants' diversion control programs, suspicious order monitoring systems, and the like). Because Defendants' letter appears to generally focus on internal DEA records relating to the meaning and interpretation of the SORs laws, as well as potential amendments to those laws, the Government likewise focuses this letter on those types of documents.

### A.    Internal DEA Documents Are Not Relevant to Statutory Interpretation

The principal relevant issues in this case are (1) whether and on how many occasions Defendants failed to report suspicious orders of controlled substances in violation of 21 U.S.C. § 832(a)(3); (2) whether such violations of 21 U.S.C. § 832(a)(3) were committed with a *mens rea* violating 21 U.S.C. § 842(a)(5); and (3) the appropriate relief, *i.e.*, penalties and injunctive relief. The disputed internal DEA documents have ***no bearing*** on any of these questions.

Defendants argue that non-public discussions among DEA personnel regarding the meanings of, and possible revisions to, the SORs laws are relevant because they may inform the

The Honorable Gerald J. Pappert
July 12, 2024
Page 3 of 5

Court's interpretation of the SORs laws. Def. Letter at 2–3. But that is wrong. Internal, informal agency documents are not relevant to the interpretation of a statute. *See, e.g.*, *United States v. Lachman*, 387 F.3d 42, 54 (1st Cir. 2004) (agency employees' private thoughts about potential amendments to governing law and matters of legal analysis are irrelevant to statutory interpretation); *United States v. Farley*, 11 F.3d 1385, 1391 (7th Cir. 1993) ("The FTC's internal documents are not relevant to [defendant's] claim that the FTC regulation . . . is impermissibly vague. This is a matter of statutory interpretation and constitutional analysis, a process which does not require the court to review the postulations of agency staff members . . . ."); *Estes v. United States*, 128 Fed. Cl. 285, 293 (Fed. Cl. 2016) (compiling authorities and explaining that "while courts may rely on various tools in interpreting regulations, including official agency interpretations, they may not consider the unpublished opinions of agency staff or other unofficial pronouncements") (internal quotations omitted). A DEA employee's private statements about the SORs laws or potential amendments thereto simply do not matter to this Court's determination of what those laws require.

Contrary to the established principle that internal agency communications are not relevant to statutory interpretation, Defendants rely on a case from the Southern District of Ohio—*United States v. Am. Elec. Power Serv. Corp.*, 2001 U.S. Dist. LEXIS 18723 (S.D. Ohio June 19, 2001) (Mag. J.), *recon. denied by* 2001 U.S. Dist. LEXIS 18722 (S.D. Ohio Aug. 13, 2001) ("*AEP*"). But that case, which involved allegations that a defendant had violated an EPA regulation, is plainly distinguishable. *AEP* followed Sixth Circuit caselaw supporting the relevance of prior **public** agency interpretations and decisions to ascertaining the meaning of a regulation; but that Sixth Circuit law does not support the proposition that informal, **purely internal** agency discussions are relevant to the meaning of a regulation (let alone a statute). In any event, even assuming *AEP* could be interpreted as adopting a general rule that informal, non-public agency documents about the meaning of a regulation are relevant to a court's interpretation of that regulation, it would go against the overwhelming weight of authority and should not be followed here. Moreover, *AEP* is even further afield because it addressed discovery into an agency's prior application and interpretation of its own regulation. Here, by contrast, in light of this Court's motion-to-dismiss decision (Dkt. 47 at 39–54), the relevant legal requirement is set forth in a statute, not a regulation. *See Loper Bright Enterprises v. Raimondo*, -- U.S. --, 2024 WL 3208360, at *16 (June 28, 2024) (finding that courts should not defer to agencies' interpretations of ambiguous statutes because "agencies have no special competence in resolving statutory ambiguities. Courts do."). *AEP* thus cannot support Defendants' requests here.

### B.    The Government Already Agreed to Produce Documents Relevant to Defendants' *Mens Re*a

To be sure, some internal DEA documents about the meaning of the SORs laws may be relevant to Defendants' *mens rea*. But the Government has already agreed to produce the non-privileged documents that could possibly bear on that issue. *See supra* Background. Outside of the discrete categories of internal DEA documents the Government already intends to produce, the internal, unofficial musings of DEA officials that were **never communicated to Defendants** and **did not concern Defendants or their conduct** simply have no relevance to what Defendants knew or understood about the SORs laws, how they interpreted the SORs laws, or the reasonableness of

The Honorable Gerald J. Pappert
July 12, 2024
Page 4 of 5

their conduct, at the time of the alleged violations. *See, e.g.*, *Farley*, 11 F.3d at 1391 (rejecting a defendant's demand for internal agency communications about the FTC regulations the defendant allegedly violated, holding that non-public "discourse among FTC staff about the meaning of the [at issue] regulations is irrelevant" and could not inform the determination whether the defendant "should, after reading the regulations, have understood" that his actions violated the law); *Consumer Fin. Prot. Bureau v. Navient Corp.*, 2018 WL 2088760, at *4 (M.D. Pa. May 4, 2018) (rejecting argument that internal agency discussions regarding the interpretation of a regulation "bear[] on the reasonableness of [the defendants'] actions" and holding that "[w]hat agency staff said in communication leading up to the issuance or non-issuance of rules, policies, or guidance has no bearing"); *United States v. Wisconsin Bell, Inc.*, 2020 WL 13048895, at *2 (E.D. Wis. Oct. 29, 2020) ("Whether Wisconsin Bell's interpretation of the LCP rule was reasonable depends on the statutes, regulations, and the official, public statements regarding the rule. Internal and interagency communications cannot be relevant to whether Wisconsin Bell's attempts to comply with the rule were reasonable or in good faith because Wisconsin Bell did not have access to them.").

###     C.     Defendants' Other Relevancy Arguments Fail

Defendants' other assertions of relevance fare no better. Defendants claim the discovery sought is relevant to "*many other issues and defenses*," and provide a list of such supposed issues. *See* Def. Letter at 3. But these "other issues and defenses" all boil down to DEA's internal understanding or interpretation of the SORs laws, and for reasons stated above, purely internal, informal agency documents are not relevant to either statutory interpretation or to Defendants' *mens rea*. Perhaps most strikingly, Defendants claim they are entitled to "***explore*** DEA-related issues in detail." Def. Letter at 3 (emphasis added). But that is not what Rule 26 provides: Defendants are entitled only to discovery that is ***relevant***; and the disputed records simply are not. Rule 26 does not authorize Defendants to broadly "explore" grievances with their regulator that have no bearing on matters at issue in this case.

Defendants also seem to suggest that the Government is not permitted to raise relevance objections at all, complaining about the Government's "unilateral" and "subjective" relevance objections. *See* Def. Letter at 3. That is wrong. Relevance is a prerequisite to discovery, and there is nothing remarkable let alone improper about the Government maintaining that certain categories of documents sought are not relevant to the dispute. *See, e.g.*, *Cutillo v. Cutillo*, 2023 WL 1971211, at *3 (E.D. Pa. Feb. 13, 2023) (denying motion to compel certain discovery requests where defendants had objected on grounds of relevance, because plaintiffs failed to meet their burden of establishing the documents' relevance); *In re Lincoln National COI Litig.*, 2019 WL 7581184, at *3–4 (E.D. Pa. July 31, 2019) (same). Defendants rely on outdated and inapposite caselaw to support their argument to the contrary. *See Sanchez v. U.S. Airways, Inc.*, 202 F.R.D. 131, 133 (E.D. Pa. 2001) (cited in Def. Letter at 3) (involving motion to compel documents the plaintiff admitted had some relevance, and decided under since-superseded version of Rule 26).

Even more confusing are Defendants' assertions that the Government's discovery positions create a "black box." *See* Def. Letter at 1–2. There is no "black box," and Defendants' complaint about the lack of a "meaningful mechanism" to "understand what documents are being withheld— let alone challenge those decisions," *id.*, is baffling. The Government has clearly laid out the

The Honorable Gerald J. Pappert
July 12, 2024
Page 5 of 5

categories of documents it intends to produce, thereby allowing Defendants to understand exactly what is, and is not, being produced. Defendants' very submission of their letter proves the point.

Finally, the Government does not argue—and has never argued—that it is subject to different discovery rules in litigation, so Defendants' argument in that regard is a red herring. *See* Def. Letter at 3–4. As stated herein, Defendants' discovery requests should be denied because they do not fall within the scope of discovery allowed by the Federal Rules for all litigants.

## III.    Defendants Seek Documents That Are Almost Exclusively Privileged

Almost all of the documents sought by many of the disputed RFPs are also likely privileged under the attorney-client and/or deliberative process privileges. In particular, Defendants seek internal agency documents relating to the meaning of the SORs laws, which will likely be almost exclusively prepared by or for agency attorneys. Moreover, documents relating to potential amendments to the SORs laws are likely protected by the deliberative process privilege, which exempts from disclosure agency "documents containing 'confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice.'" *Bayliss v. New Jersey State Police*, 622 Fed. App'x 182, 185 (3d Cir. 2015) (quoting *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 853 (3d Cir. 1995)). To be clear, the Government is not making blanket privilege assertions; if the Court determines the disputed records are an appropriate subject of discovery, the Government would assert privilege over any responsive documents on a document-by-document basis. However, the fact that the vast majority of responsive documents are likely to be privileged is relevant to the assessment of burden and proportionality. Here, given that almost all documents responsive to many of the RFPs at issue would be withheld on grounds of privilege, the burden of searching, reviewing, and producing any non-privileged documents and logging the rest is disproportionate. *See City of Chicago v. DoorDash, Inc.*, 2023 WL 3654259, at \*3 (N.D. Ill. May 25, 2023) (denying motion to compel in part due to "the privileged nature of most [responsive] communications"); *In re Domestic Drywall Litig.*, 2016 WL 4414640, at \*8 (E.D. Pa. Aug. 8, 2016) (denying motion to compel discovery into pre-suit investigative materials due to limited relevance and because "[s]uch discovery would likely heavily involve, if not exclusively involve, privileged material and attorney work-product").

\* \* \*

For these reasons, the Government respectfully requests that the Court deny Defendants' requested relief. The Government is available to appear for a discovery conference to address these matters further.

Respectfully submitted,

/s/ *Deborah S. Sohn*
Deborah S. Sohn
Trial Attorney
U.S. Department of Justice
Consumer Protection Branch

cc: Counsel of Record (by e-mail)

# ATTACHMENT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>              v.<br><br>AMERISOURCEBERGEN CORPORATION;<br>AMERISOURCEBERGEN DRUG<br>CORPORATION; and INTEGRATED<br>COMMERCIALIZATION SOLUTIONS, LLC,<br><br>        Defendants. | Case No. 2:22-cv-05209-GJP |

<u>**DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION**</u>

Defendants AmerisourceBergen Corporation, AmerisourceBergen Drug Corporation, and Integrated Commercialization Solutions, LLC, by and through their undersigned counsel, hereby serve this First Set of Requests for Production of Documents (the "Requests") upon Plaintiff United States of America.

**DEFINITIONS**

1.        "Action" means the above-captioned lawsuit filed by Plaintiff United States of America against Defendants AmerisourceBergen Corporation, AmerisourceBergen Drug Corporation, and Integrated Commercialization Solutions, LLC in the United States District Court for the Eastern District of Pennsylvania.

2.        "Alleged Violations" means all controlled substances orders that You are claiming in this Action that any Defendant should have reported to the DEA as a Suspicious Order, but did not report in alleged violation of 21 U.S.C. § 832(a), 21 U.S.C. § 842(a)(5), and/or 21 C.F.R. § 1301.74(b).

3.     "AmerisourceBergen Investigation" means the investigation of Defendants' diversion control practices and distribution of controlled substances conducted by multiple United States Attorneys' Offices and the DEA beginning in or about 2012 and culminating in the filing of the Complaint.

4.     "Annual Production Quotas" means the annual production quotas set for certain controlled substances pursuant to 21 U.S.C. § 826(a)(1).

5.     "Applicable Customers" means all customers that placed an order that You claim is an Alleged Violation.

6.     "ARCOS" means the Automated Reports and Consolidated Ordering System.

7.     "Communication" means any transfer of information of any type, whether written, oral, electronic or otherwise.

8.     "Complaint" means the Complaint filed by Plaintiff United States of America against Defendants AmerisourceBergen Corporation, AmerisourceBergen Drug Corporation, and Integrated Commercialization Solutions, LLC on December 29, 2022.

9.     "Controlled substances" shares the definition in 21 U.S.C. § 802(6).

10.     "CSA" means the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.

11.     "DEA" means the Drug Enforcement Administration, a component of DOJ, and any representative, employee, executive, official, agent, fiduciary, or Person acting on behalf of the DEA.

12.     "Defendants" means AmerisourceBergen Corporation, AmerisourceBergen Drug Corporation, and Integrated Commercialization Solutions, LLC, and any director, officer, employee, representative, agent, or Person acting on behalf of any of them.

2

13.     "Document" is used in its broad sense to include, without limitation, things printed or produced by any process, or written, and/or produced by hand, or by any electronic, photographic, magnetic, optical, mechanical or computer process, including without limitation: notes, correspondence, Communications of any nature, memoranda, electronic mail, website or blog posts, tweets, posts or messages on social networking sites, text messages, instant messages, faxes, spreadsheets, notebooks of any character, summaries or records of personal conversations, reports, publications, disks, photographs, films, voice mails, audio tapes, facsimiles, microfilm or microfiche, drawings, graphs, charts, and other data compilations.  A draft or non-identical copy is considered a separate Document.

14.     "DOJ" means the United States Department of Justice, including all of its components and subdivisions, and any representative, employee, executive, official, agent, fiduciary, or Person acting on behalf of the Department of Justice.

15.     "GAO" means the Government Accountability Office and any representative, employee, executive, official, agent, fiduciary, or Person acting on behalf of the Government Accountability Office.

16.     "GAO Reports" means the reports titled *Prescription Drugs: More DEA Information about Registrants' Controlled Substances Roles Could Improve Their Understanding and Help Ensure Access*, GAO-15-471 (June 25, 2015) and *Drug Control: Actions Needed to Ensure Usefulness of Data on Suspicious Opioid Orders*, GAO-20-118 (January 29, 2020).

17.     "Masters Decisions" means the decisions in *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55417 (DEA Sept. 15, 2015) and *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, 861 F.3d 206 (D.C. Cir. 2017).

3

18.    "NACDS Letter" means the February 6, 2018 letter from the National Association of Chain Drug Stores to Demetra Ashley, Acting Assistant Administrator, Diversion Control Division regarding the D.C. Circuit's *Masters* decision.

19.    "OIG" means the U.S. Department of Justice Office of the Inspector General and any representative, employee, executive, official, agent, fiduciary, or Person acting on behalf of the U.S. Department of Justice Office of Inspector General.

20.    "OIG Report" means the report titled *Review of the DEA's Regulatory and Enforcement Efforts to Control the Diversion of Opioids* (Sept. 2019).

21.    "OMB" means the Office of Management and Budget, including the Office of Information and Regulatory Affairs, and any representative, employee, executive, official, agent, fiduciary, or Person acting on behalf of the Office of Management and Budget.

22.    "Opioid MDL" means all cases consolidated in the multi-district litigation captioned *In re National Prescription Opiate Litig.*, MDL No. 2804 (N.D. Ohio).

23.    "Orlando Order" means the April 27, 2007 Order to Show Cause and Immediate Suspension Order of Registration related to AmerisourceBergen Drug Corporation's Orlando distribution center, as modified on April 27, 2007.

24.    "Orlando Settlement Agreement" means the Settlement and Release Agreement between the DEA and AmerisourceBergen Drug Corporation, entered into on June 22, 2007.

25.    "Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office or other business or legal entity, whether private or governmental.

26.     "Rannazzisi Letters" mean the letters from Joseph Rannazzisi of the DEA to Registrants dated September 27, 2006, February 7, 2007,  December 27, 2007, and June 12, 2012.

27.     "Registrant" refers to any entity encompassed in the definition found in 21 C.F.R. § 1300.01(b).

28.     "Rule" shares the definition assigned to the same term by the Administrative Procedure Act, 5 U.S.C. § 551(4).

29.     "SUPPORT Act" means the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act, Pub. L. 115-271, 132 Stat. 3894.

30.     "Suspicious Order" refers to the definitions in 21 C.F.R. § 1301.74(b) and/or 21 U.S.C. § 802(57).

31.     "Suspicious Order Monitoring and Reporting Obligations" means the obligations set forth in 21 U.S.C. § 832 and/or 21 C.F.R. § 1301.74.

32.     "Suspicious Order Reports" means reports of Suspicious Orders made to the DEA pursuant to the Suspicious Order Monitoring and Reporting Obligations.  For the avoidance of doubt, this term also includes any reports of Suspicious Orders made pursuant to the Orlando Settlement Agreement or any other agreement with the DEA.

33.     "You" or "Your" mean Plaintiff United States of America, including but not limited to the DOJ and the DEA.

34.     "2020 SOR Notice" means the Notice of Proposed Rulemaking titled *Suspicious Orders of Controlled Substances*, 85 Fed. Reg. 69,282, issued by the DEA on November 2, 2020.

## INSTRUCTIONS

1.      These requests are ongoing and require periodic and timely supplementation up to and through the completion of any trial of this Action.

2.      The original of any photocopies that are produced shall be kept and made available for inspection upon request.

3.      All responsive Documents must be produced in exactly the same form as they are kept in the ordinary course of business, *i.e.*, Documents attached to each other must not be separated and any photocopies produced must be bound in the same manner as the originals.

4.      All responsive Documents are to be produced in the original file folder, envelope or other container in which they were kept in the ordinary course of business.  If, for any reason, the container cannot be produced, then You must produce copies of all labels, envelopes, containers, or other identifying marks (such as file cabinet labels).

5.      Any Document bearing any marks appearing on any sheet or side thereof, including, without limitation, initials, stamped indicia, comments, and/or notations, which are not part of the original text or photographic reproduction thereof, is to be considered a separate Document.

6.      The terms "all," "any," and "each" shall be construed as encompassing any and all.

7.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request for production all responses that might otherwise be construed to be outside its scope.

8.      The term "regarding," is to be understood in its broadest sense, and includes identifying, evidencing, summarizing, commenting upon, referring to, describing, digesting,

reporting, listing, analyzing, studying, discussing, stating, setting forth, reflecting, regarding, addressing, interpreting, recording, including, supporting, negating, contradicting, manifesting, containing, constituting, comprising or resulting from the subject matter identified.

9.      If You object to any request calling for the production of certain Documents (or any portion thereof) on the grounds of attorney/client privilege, the work-product doctrine, the deliberative process privilege, the doctrine of executive privilege, the law enforcement privilege, and/or any other claim or privilege, then, as to such Documents allegedly subject to such asserted objections, You are required to identify such Documents, in writing, with sufficient specificity to permit the Court to reach a determination in the event of a motion to compel or quash, together with an indication of the specific doctrine or privilege that is the basis of the objection.  If the full identification and/or production of a Document is objected to because of the attorney/client privilege, the work-product doctrine, the deliberative process privilege, the doctrine of executive privilege, the law enforcement privilege, or any other doctrine or claim of privilege, provide the following information regarding said Document: the nature of the Document (e.g., interoffice memoranda, correspondence, report, etc.), the author and sender, the recipient of each copy, the date, the name of each person to whom the original and any copy was circulated, the names appearing on any circulation list associated with such Document, and a summary statement of the subject matter of the Document in sufficient detail to permit the Court to reach a determination in the event of a motion to compel or quash.

10.      In responding to these requests, if You encounter any ambiguity in construing an individual request or any definitions and instructions relevant thereto, You shall set forth the matter or term deemed "ambiguous" and the construction chosen or used in responding to such request.

11.     Unless otherwise agreed, all Documents, including electronically stored information ("ESI"), shall be produced according to the following specifications:

    a.   Image files shall be produced for all responsive Documents, and in all cases each such image file shall bear a sequentially numbered Bates stamp.  All such Documents shall be produced in 300 DPI Group IV Black & White Tagged Image File Format (.TIFF or .TIF) files, in single-page format and 8 1/2 x 11 inch page size (except for Documents requiring a different page size), along with corresponding image load files (.OPT format except as otherwise agreed).  Where production of a Document in color is necessary to understand the content of such Document, the Document will be subsequently identified and communicated to You, and You shall then produce such Document in color in a .JPG format.

    b.   For all readily imageable ESI, produced image files shall contain all displayable data associated with that ESI.  Word Documents, and other similar Documents generated from word processing software, shall be produced in the above-described image format with tracked changes and comments showing.

    c.   For all other ESI, unless the Document corresponds to Your assertion of an applicable privilege, You shall produce the Document in native format together with a corresponding Bates numbered slip sheet noting that the file has been produced natively.  Such ESI file types include, without limitation:  presentation files (including but not limited to Microsoft PowerPoint files); spreadsheet files (including but not limited to Microsoft Excel files); and audio and/or video recordings.  Where You are asserting a privilege in connection with such ESI, where practicable, rather than producing a native version of the file, produce an

8

image displaying all viewable data from the Document except for content that
You have redacted due to Your assertion of an applicable privilege.  If there are
cases where it is not practicable to produce such an image, produce a redacted
version of the native file where redactions are clearly indicated as such.

d.  All TIFF files are to be provided with an accompanying searchable text (.TXT)
file, and such text files shall contain the full text extraction.  During the process of
converting ESI from the electronic format of that application in which the ESI is
normally created, viewed, and/or modified to TIFF, metadata values should be
extracted and produced in a load file.  All ESI shall be produced with at least the
metadata fields identified on Appendix A to these Requests.

e.  Parent-child relationships (e.g., the associations between emails and their
attachments) shall be preserved.  Email and other ESI attachments shall be
produced as independent files immediately following the parent email or ESI
record.  Parent-child relationships shall be identified in the metadata load file.

f.  All versions of any responsive ESI file are responsive, and shall not be withheld
on the basis that other versions will be produced in the resulting production.

g.  Any and all encrypted and/or password-protected ESI files shall be decrypted
and/or supplied with the corresponding password that will allow full access to the
ESI file's content.

h.  Compressed file types (i.e., .zip, .rar, .7z) shall be extracted prior to production
resulting in the production of individual files.

i.   Responsive Documents not maintained as ESI shall be scanned or otherwise
converted into electronic format to the extent possible consistent with the protocol
for ESI productions described above, with the following modifications:

    i.   When scanning paper Documents, distinct Documents should not be
merged into a single record, and single Documents should not be split into
multiple records (i.e., paper Documents should be logically unitized). You
shall make reasonable efforts to have Documents unitized correctly and
reasonably address situations where You fail to do so.

    ii.  Color Documents (e.g., color photographs or graphical representations in
color) shall be scanned as black & white, single-page TIFF images in
accordance with the specifications and terms set out above (i.e., subject to
follow-up instructions in certain cases to produce full color images where
a color image is necessary to understand a Document's content).

    iii. Consistent with the practice followed when scanned Documents were
produced in the AmerisourceBergen Investigation, for all scanned
Documents that are produced, You shall provide sufficient corresponding
metadata to make clear custodian or storage location of the scanned
Documents (e.g., custodian, box number, etc.) and any description used on
folders, binders, or other similar filing system where the scanned
Document was kept in the ordinary course of Your operations.

j.  Productions shall be made on optical media (CD/DVD), external hard drive,
secure FTP site or similar electronic format.  Deliverable media should be
encrypted and labeled with the name of the action, the identity of the producing

party, and the following information: volume name, production Bates range(s), and the date of delivery.

12.      If objection is made to any of the requests, state in Your response whether Documents are being withheld from inspection and production on the basis of such objection, or whether inspection and production of the responsive Documents will occur notwithstanding such objection.

13.      If there are no Documents responsive to any particular request, state so in Your response to that particular request.

14.      Unless otherwise stated, the timeframe for the Documents requested herein is January 1, 2014 through the present, and continuing forward to the extent that You are seeking to recover for alleged ongoing violations (the "Relevant Period").

## REQUESTS FOR PRODUCTION

1.      Without regard to the Relevant Period, all Documents regarding the DEA's interpretation and/or understanding of the Suspicious Order Monitoring and Reporting Obligations, what constitutes a Suspicious Order, and/or how Registrants may discharge their obligations to design and operate a suspicious order monitoring system, including but not limited to:

      a.  all internal DEA Communications;

      b.  all DEA external or internal manuals, policies, procedures, guidelines, position statements, training materials, or other internal or external guidance Documents;

      c.  all Communications between the DEA and any Registrant;

    d.   all Communications between the DEA and any other branch, agency, or instrumentality of the United States, including but not limited to Congress, DOJ, GAO, OIG, and OMB, and all Documents regarding such Communications; and

    e.   all Communications between the DEA and any state or local government or instrumentality, including but not limited to any board of pharmacy, and all Documents regarding such Communications.

2.    Without regard to the Relevant Period, all Documents regarding the meaning of Suspicious Order, including but not limited to any ambiguity, vagueness, imprecision, or subjectivity in the meaning or application of the term.

3.    Without regard to the Relevant Period, all Documents regarding whether or how the Suspicious Order Monitoring and Reporting Obligations apply to "orders of interest" (or other similar terminology used to describe orders that hit a Registrant's threshold, parameter, or algorithm).

4.    Without regard to the Relevant Period, all Documents regarding requests or suggestions made to the DEA by Defendants, other Registrants, trade associations, industry groups, any branch, agency, or instrumentality of the United States, or any other Person to clarify or provide guidance regarding the Suspicious Order Monitoring and Reporting Obligations, what constitutes a Suspicious Order, and/or how to design and operate a suspicious order monitoring system.

5.    Without regard to the Relevant Period, all Documents regarding any responses (or lack thereof) made by the DEA to Defendants, other Registrants, trade associations, industry groups, any branch, agency, or instrumentality of the United States, or any other Person to clarify or provide guidance regarding the Suspicious Order Monitoring and Reporting Obligations, what

constitutes a Suspicious Order, and/or how to design and operate a suspicious order monitoring system.

6.      Without regard to the Relevant Period, all Documents regarding the preparation, drafting, and approval of the 2005 Distributor Initiative presentation materials and the Rannazzisi Letters.

7.      All Documents regarding:

   a.  the DEA's interpretation or understanding of the Masters Decisions;

   b.  any Rule You contend was created or otherwise established by either of the Masters Decisions;

   c.  the DEA's internal or external guidance or training materials regarding the Masters Decisions; and

   d.  requests to DEA for guidance about the Masters Decisions (including the NACDS Letter), and the DEA's response (or lack thereof) to such requests.

8.      Without regard to the Relevant Period, all Communications between the DEA and any Defendant regarding the Suspicious Order Monitoring and Reporting Obligations, what constitutes a Suspicious Order, and/or how to design and operate a suspicious order monitoring system, and all Documents regarding such Communications including but not limited to notes or summaries of meetings or phone calls with Defendants.

9.      Without regard to the Relevant Period, all Communications between the DEA and any industry group or trade association, including but not limited to the Healthcare Distribution Management Association, Healthcare Distribution Alliance, and National Association of Chain Drug Stores, regarding the Suspicious Order Monitoring and Reporting Obligations, what constitutes a Suspicious Order, how to design and operate a suspicious order monitoring system,

and/or any other diversion control obligations for distributors of controlled substances, and all Documents regarding such Communications including but not limited to notes or summaries of meetings or phone calls.

10.      Without regard to the Relevant Period, all Documents regarding any discussion, dispute, disagreement, difference of opinion, confusion, or misunderstanding within the DEA regarding the Suspicious Order Monitoring and Reporting Obligations, what constitutes a Suspicious Order, and/or how to design and operate a suspicious order monitoring system.

11.      Without regard to the Relevant Period, all Documents regarding any contemplated amendments, modifications, revisions, updates, or changes to 21 C.F.R. § 1301.74 or the formulation, amendment, repeal, issuance, or adoption of new rules or regulations related to suspicious order monitoring and reporting, regardless of whether such action was ever finalized, proposed, or taken.

12.      All Documents regarding the 2020 SOR Notice, including but not limited to:

   a.   All drafts of the 2020 SOR Notice;

   b.   All calculations of estimated times, costs, and reports of Suspicious Orders as set forth in the 2020 SOR Notice;

   c.   the drafting, formulation, internal approvals, and issuance of the 2020 SOR Notice;

   d.   all comments received in response to the 2020 SOR Notice and all Documents regarding such comments;

   e.   all Communications regarding the 2020 SOR Notice with any other branch, agency, or instrumentality of the United States, including but not limited to

14

Congress, DOJ, GAO, OIG, and OMB, and all Documents regarding such Communications;

    f.   the timing of the issuance of the 2020 SOR Notice, including the reasons for any delays; and

    g.   the status of the proposed rule announced by the 2020 SOR Notice.

13.    All Documents regarding the proposal and subsequent enactment of the Suspicious Order Monitoring and Reporting Obligations in the SUPPORT Act, including but not limited to the reasons or impetus for such provisions, the meaning and interpretation of such provisions, and the interplay of those provisions with the Suspicious Order Monitoring and Reporting Obligations in 21 C.F.R. § 1301.74.

14.    All Documents regarding any comment or input that the DEA or DOJ provided relating to the SUPPORT Act before it was enacted.

15.    All Documents regarding the DEA's estimates of diversion for prescription opioids pursuant to the SUPPORT Act.

16.    All Documents regarding the Alleged Violations.

17.    All Documents constituting or reflecting analysis received, performed, or reviewed by DEA regarding the Alleged Violations or the Applicable Customers.

18.    All Documents constituting or reflecting analysis received, performed, or reviewed by DEA in response to any Suspicious Order Reports for the Applicable Customers.

19.    All Documents reflecting Communications with the relevant state agencies about any Applicable Customer relating to diversion control or licensing.

20.    Without regard to the Relevant Period, all Communications between the DEA and Defendants regarding Suspicious Order Reports for the Applicable Customers, and all

Documents regarding such Communications, including but not limited to notes or summaries of meetings, phone calls, or interviews.

21.     All Documents obtained from any third party regarding the Alleged Violations.

22.     Without regard to the Relevant Period, all investigative files related to potential diversion by the Applicable Customers.

23.     From 2010 to the present, all DEA inspection or audit reports for the Applicable Customers.

24.     From 2007 to the present, all Documents estimating or quantifying potential diversion by any Applicable Customer or associated with any Alleged Violation.

25.     All ARCOS data for the Applicable Customers.

26.     Without regard to the Relevant Period, all Documents regarding any actions that the DEA took or considered but did not take in response to Suspicious Order Reports it received from Defendants or other Registrants for the Applicable Customers, including, but not limited to, investigative files, internal and external Communications, analysis, and notes or summaries of meetings, calls, or interviews of representatives of Defendants or the Applicable Customers.

27.     All DEA manuals, policies, procedures, guidelines, position statements, training materials, or other guidance Documents regarding the receipt, handling, investigation, and disposition of Suspicious Order Reports.

28.     Documents sufficient to show how DEA tracked the receipt and disposition of Suspicious Order Reports it received from Defendants.

29.     All Documents reflecting when any DEA personnel accessed or reviewed any Suspicious Order Reports it received from Defendants.

30.     Without regard to the Relevant Period, all Communications between DEA headquarters and DEA field offices regarding Suspicious Order Reports submitted by Defendants for the Applicable Customers, and all Documents regarding such Communications, including but not limited to notes or summaries of meetings, calls, or interviews of representatives of Defendants.

31.     Documents sufficient to show on an annual basis the number of Suspicious Order Reports that the DEA received in total and the number received from each reporting Registrant.

32.     All Documents relating to the DEA's projections or estimates of the number of Suspicious Orders Reports it expects to receive, including but not limited to the basis for the estimates contained in the 2020 SOR Notice.

33.     All summary reports, statistics, or tracking metrics that the DEA maintains related to Suspicious Order Reports.

34.     All Documents regarding actual or potential over-reporting of Suspicious Orders to the DEA, including the expected or actual impact on healthcare providers or patients of such over-reporting.

35.     All Documents regarding the DEA's resources, staffing, and funding to investigate Suspicious Order Reports.

36.      Documents sufficient to describe any technology that the DEA uses or has used to investigate or review Suspicious Order Reports.

37.     All Documents discussing, analyzing, or characterizing the usefulness (or lack thereof) of Suspicious Order Reports.

38.     All Documents evaluating, assessing, or criticizing the DEA's use (or lack of use) of Suspicious Order Reports.

17

39.     All Documents regarding plans to change how the DEA uses or will use Suspicious Order Reports.

40.     All Congressional testimony and submissions by current or former DEA representatives regarding the Suspicious Order Monitoring and Reporting Obligations, what constitutes a Suspicious Order, and/or Suspicious Order Reports.

41.     All Communications between the DEA and any other branch, agency, or instrumentality of the United States, including but not limited to Congress, DOJ, GAO, OIG, and OMB, regarding whether, how, and to what extent the DEA uses Suspicious Order Reports, and all Documents regarding such Communications.

42.     Without regard to the Relevant Period, Documents sufficient to show on an annual basis the number of Suspicious Order Reports that the DEA received for each Applicable Customer in total and broken down by reporting Registrant.

43.     Without regard to the Relevant Period, all Suspicious Order Reports that the DEA received for the Applicable Customers from any Registrant other than Defendants.

44.     Without regard to the Relevant Period, all Documents regarding any notification to the DEA or the DEA's knowledge that any Registrant had terminated the ability of any Applicable Customer to purchase controlled substances.

45.     All Documents regarding any actions that the DEA took or considered but did not take in response to notification from any Defendant or other Registrant that it had terminated the ability of any Applicable Customer to purchase controlled substances, including any investigative files, internal and external Communications, and data analysis.

46.     Without regard to the Relevant Period, all Documents regarding the DEA's decision to discontinue its practice of notifying other distributors when it received notice that a distributor had terminated a customer's ability to purchase controlled substances.

47.     Without regard to the Relevant Period, all Documents regarding the DEA's consideration of whether and to what extent to provide distributors with access to ARCOS data showing a customer's purchases of controlled substances from other distributors.

48.     All Documents regarding the DEA's analysis, evaluation, or consideration of any impediments, challenges, or obstacles to Registrants' ability to comply with the Suspicious Order Monitoring and Reporting Obligations.

49.     From 2007 to the present, all DEA registration and renewal files for Defendants' distribution centers, including but not limited to all Documents regarding the DEA's consideration and approval of registration or renewal applications submitted by Defendants.

50.     All DEA manuals, policies, procedures, guidelines, or other guidance Documents governing the consideration and approval/denial of registration or renewal applications.

51.     All DEA registration and renewal files for the Applicable Customers, including but not limited to all Documents regarding the DEA's consideration and approval/denial of registration or renewal applications submitted by the Applicable Customers.

52.     Documents sufficient to show the DEA's efforts, if any, to suspend or revoke the registration of any Applicable Customer.

53.     Documents sufficient to show any regulatory or legal actions that the DEA or DOJ has taken against any Applicable Customer or any owner, employee, pharmacist, or other representative of an Applicable Customer related to potential diversion of controlled substances, including any orders, judgments, settlements, or agreements.

54.     Documents sufficient to show the registration status of the Applicable Customers.

55.     From 2007 to the present, all Documents regarding the DEA's audits of Defendants' distribution centers and the results and findings of such audits, including but not limited to all Form 6 Reports of Investigation relating to those audits.

56.     All DEA manuals, policies, procedures, guidelines, or other guidance Documents regarding distribution center audits, including but not limited to the way in which a distribution center audit should be conducted and how the results of that audit should be communicated to the registrant subject to the audit.

57.     All internal DEA Communications regarding Defendants' diversion control programs, suspicious order monitoring systems, suspicious order reporting practices, or number of Suspicious Order Reports (including any drop in Suspicious Order Reports), and all Documents regarding such Communications.

58.     All Communications between the DEA and Defendants regarding Defendants' diversion control programs, suspicious order monitoring systems, suspicious order reporting practices, or number of Suspicious Order Reports (including any drop in Suspicious Order Reports), and all Documents regarding such Communications, including but not limited to any notes or summaries of meetings, calls, or interviews with Defendants.

59.     All Communications between the DEA and any third parties regarding Defendants' diversion control programs, suspicious order monitoring systems, or suspicious order reporting practices, or number of Suspicious Order Reports (including any drop in Suspicious Order Reports), and all Documents regarding such Communications, including but not limited to any notes or summaries of meetings, calls, or interviews.

60.     From 2007 to the present, all Documents regarding the DEA's or DOJ's knowledge of the design, operation, and workings of, including any updates and/or changes to, Defendants' diversion control programs and/or suspicious order monitoring systems, including the "dual-trigger" as alleged in paragraph 185 of the Complaint.

61.     Without regard to the Relevant Period, all Documents regarding the Compliance Reviews performed by the DEA pursuant to Section 2(c) of the Orlando Settlement Agreement, including but not limited to the results and findings of such Compliance Reviews.

62.     All Communications between the DEA and any Defendant in 2007 regarding the development, review, and/or approval of AmerisourceBergen Drug Corporation's enhanced suspicious order monitoring system.

63.     Without regard to the Relevant Period, all Documents regarding the DEA's decision to dissolve the Orlando Order, including but not limited to the reasons for that decision.

64.     Documents sufficient to show whether and how the DEA used the daily reports of controlled substances sales that AmerisourceBergen Drug Corporation submitted to the DEA pursuant to Section 1(b) of the Orlando Settlement Agreement.

65.     From 2007 to the present, all Documents regarding the DEA's public statements about any Defendant's diversion control program and/or suspicious order monitoring system, including but not limited to statements made at any DEA industry conferences.

66.     From 2007 to the present, all Documents relating to DEA's invitation to any Defendant to speak at any DEA industry conferences and any follow up Communications from such conferences.

67.     All Documents relating to DEA statements to Registrants not to report every order that is flagged by a Registrant's suspicious order monitoring system, including but not limited to at the May 10-11, 2016 HDMA conference.

68.     All Documents relating to Defendants' offers to present and/or presentation of their suspicious order monitoring systems to DOJ and/or DEA, including but not limited to the December 2016 presentation and the "Briefing Book" submitted in January 2017, and any responses (or lack thereof).

69.     All Documents relating to DEA and/or DOJ's knowledge of FTI Consulting's ("FTI") involvement in the design of a revised suspicious order monitoring system for Defendants, including but not limited to all Communications with FTI.

70.      All Documents relating to DEA and/or DOJ's knowledge of Pharma Compliance Group's ("PCG")  involvement in Applicable Customer audits, including but not limited to all Communications with PCG.

71.     All Documents relating to DEA and/or DOJ's knowledge of the reject but not report category of orders used by Defendants.

72.     All Documents regarding the May 25, 2018 letter from David May of AmerisourceBergen to John Martin, Assistant Administrator, Diversion Control Division of the DEA requesting a meeting to discuss how AmerisourceBergen Drug Corporation's order monitoring program can better serve the diversion control objectives of the DEA, including but not limited to all internal DEA Communications regarding the letter and the DEA's response to the letter.

73.     All Documents regarding the setting of Annual Production Quotas.

74.     All Communications between the DEA, on the one hand, and GAO, OIG, OMB, or Congress, on the other hand, regarding the Suspicious Order Monitoring and Reporting Obligations, what constitutes a Suspicious Order, how to design and operate a suspicious order monitoring system, and/or Suspicious Order Reports.

75.     All Documents regarding the DEA's evaluation of, response to, and/or efforts to comply with the observations and recommendations contained in the GAO Reports.

76.     All Documents regarding the DEA's evaluation of, response to, and/or efforts to comply with the observations and recommendations contained in the OIG Report.

77.     All Documents submitted by DEA to the House Energy and Commerce Committee as part of its investigation that resulted in the report *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia*, including but not limited to all Documents produced to the Committee (inclusive of the Majority and Minority Staff), all written statements provided to the Committee (inclusive of the Majority and Minority Staff), and all notes, presentations, handouts, and Communications relating to the multiple briefings from the DEA to Committee Staff referenced in the Report.

78.     All Documents regarding evaluations, complaints, or criticisms of Joseph T. Rannazzisi's performance as Deputy Assistant Administrator of the Office of Diversion Control, including any such evaluations, complaints, or criticisms contained in Mr. Rannazzisi's personnel file.

79.     All Documents regarding evaluations, complaints, or criticisms of the performance of any senior official of the Office of Diversion Control, including the assistant administrator, senior policy advisor, deputy assistant administrator(s), and section chief(s).

80.     All Documents regarding the OIG's investigation into Joseph T. Rannazzisi beginning in or about 2014.

81.     Documents sufficient to show the organizational structure of the DEA, including but not limited to which offices and employees were responsible for diversion control and which offices and employees were responsible for which geographical areas of the country.

82.     Without regard to the Relevant Period, all Documents regarding the DEA's compliance or non-compliance with the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, as it relates to any collection of information related to the Suspicious Order Monitoring and Reporting Obligations or Suspicious Order Reports, including Documents demonstrating whether the DEA obtained authorization from the OMB for the collection of such information.

83.     Without regard to the Relevant Period, all Communications between the DEA and OMB regarding any submission seeking OMB approval under the Paperwork Reduction Act for any collection of information related to the Suspicious Order Monitoring and Reporting Obligation or Suspicious Order Reports, and all Documents regarding such Communications.

84.     All Documents that the DEA or DOJ produced, whether pursuant to subpoenas, *Touhy* requests, Freedom of Information Act requests, or otherwise, in connection with the Opioid MDL or any state court opioid litigation against manufacturers, distributors, or pharmacies.

85.     All written statements, affidavits, declarations, or other sworn statements from the DEA or any of its current or former representatives in connection with the Opioid MDL or any state court opioid litigation against manufacturers, distributors, or pharmacies.

24

86.     All transcripts of any testimony of the DEA or any of its current or former representatives in connection with the Opioid MDL or any state court opioid litigation against manufacturers, distributors, or pharmacies.

87.     All Communications and Documents exchanged between DEA or DOJ, on the one hand, and plaintiffs and/or their counsel in the Opioid MDL (including, without limitation, in *City of Huntington v. AmerisourceBergen Drug Corp.*, 17-cv-01362 (S.D. W.Va.)) or in any state court opioid litigation against manufacturers, distributors, or pharmacies, on the other hand, in connection with those actions.

88.     All Documents received or otherwise obtained from third parties in connection with the AmerisourceBergen Investigation.

89.     All DEA Form 6 Reports of Investigation, summaries, or transcripts for any interviews conducted in connection with the AmerisourceBergen Investigation, and all exhibits used or referred to at such interviews.

90.     All witness statements obtained pursuant to or in connection with the AmerisourceBergen Investigation.

91.     All Communications between the DOJ or DEA, on the one hand, and any of Defendants' current or former employees, on the other hand, in connection with the AmerisourceBergen Investigation or the subject matter of this Action.

92.     Other than Documents produced by Defendants in the AmerisourceBergen Investigation, all Documents regarding the "faulty electronic order monitoring algorithms" and "deficient" order monitoring systems as alleged in paragraph 11 of the Complaint.

93.     All Documents upon which You relied for the allegation in paragraph 53 of the Complaint that distributors are required to report an order as suspicious to the DEA "unless the distributor investigates the order and dispels all suspicion relating to the order."

94.     All Documents regarding the profitability calculations set forth or referenced in the Complaint including, but not limited to, in paragraphs 80-86.

95.     Other than Documents produced by Defendants in the AmerisourceBergen Investigation, all Documents regarding Your allegation in paragraph 178 of the Complaint that "ABC deliberately designed ROMP in a way that failed to flag many statistically unusual orders."

96.     All Documents regarding the allegations in paragraphs 282 and 283 of the Complaint about Distributor 2.

97.     All Documents that You reviewed or upon which You relied in drafting the Complaint.

98.     Other than Documents produced by Defendants in the AmerisourceBergen Investigation, all Documents regarding the factual allegations in the Complaint that relate to Defendants' alleged liability.

99.     All Documents that You intend to use or rely upon at any deposition, hearing, or trial in connection with the Action.

100.    All Documents regarding any expert witness You expect to call at trial, including but not limited to (i) the expert's resume or curriculum vitae; (ii) all reports that show the facts, opinions, or conclusions as to which the expert is expected to testify; (iii) any nonprivileged materials created by or provided to the expert that relate in any way to this Action; (iv) all Documents that the expert relied on in forming his/her opinions; (v) all articles, books, book

chapters, speeches, and other presentations created by the expert during the past ten years that relate in any way to the opinions or conclusions reached by the expert in connection with this Action; and (vi) all testimony given by the expert as an expert witness during the past ten years.

101.    All Documents that You referenced, reviewed, or relied upon in drafting Your responses to these Requests and/or Your responses to the First Set of Interrogatories.

102.    Documents sufficient to show the DEA's Document retention policies for the entirety of the Relevant Period.

Dated: June 5, 2023

/s/ Stuart T. Steinberg
Andrew J. Levander
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10095
212-698-3500
andrew.levander@dechert.com

Michael S. Doluisio
Stuart T. Steinberg
Catherine V. Wigglesworth
DECHERT LLP
Cira Centre
2929 Arch St.
Philadelphia, PA 19104
215-994-4000
michael.doluisio@dechert.com
stuart.steinberg@dechert.com
catherine.wigglesworth@dechert.com

D. Brett Kohlhofer
DECHERT LLP
1900 K St., NW
Washington, DC 20006
202-261-3300
d.brett.kohlhofer@dechert.com

Lawrence S. Lustberg
GIBBONS, P.C.
One Gateway Center
Newark, NJ 07102
973-596-4500

llustberg@gibbonslaw.com

Meredith S. Auten
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215-963-5000
meredith.auten@morganlewis.com

*Counsel for Defendants AmerisourceBergen
Corporation, AmerisourceBergen Drug
Corporation, and Integrated
Commercialization Solutions, LLC*

28

# Appendix A

| |
|---|
| Custodian |
| Author |
| BEGDOC# |
| ENDDOC# |
| PGCOUNT |
| ProdBegAtt |
| ProdEndAtt |
| ProductionVolume |
| RecordType |
| From |
| To |
| CC |
| BCC |
| Subject |
| DateSent |
| DateReceived |
| SortDateTime |
| DateCreated |
| DateLastMod |
| Filesize |
| Filename |
| Application |
| EDFOLDER |
| Paragraph |
| MD5 Hash |
| AttachCount |
| FileDescription |
| Comments |
| Text Path |
| FILE PATH |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on  June 5, 2023, I served the foregoing upon the following counsel

of record via electronic and U.S. mail.

Anthony D. Scicchitano
Landon Y. Jones III
Assistant U.S. Attorneys
U.S. Attorney's Office for the Eastern District
of Pennsylvania
615 Chestnut St. Suite 1250
Philadelphia, PA 19106
(215) 861-8200
anthony.scicchitano@usdoj.gov
landon.jones@usdoj.gov

Jordann R. Conaboy
Assistant U.S. Attorney
U.S. Attorney's Office for the District of New
Jersey
970 Broad Street, 7th Floor
Newark, NJ 07102
973-645-3883
jordann.conaboy@usdoj.gov

Diane C. Leonardo
Assistant U.S. Attorney
U.S. Attorney's Office for the Eastern District
of New York
610 Federal Plaza, 5th Floor
Central Islip, NY 11722
631-715-7854
diane.beckmann@usdoj.gov

Elliot Schachner
Assistant U.S. Attorney
U.S. Attorney's Office for the Eastern District
of NY
271 Cadman Plaza East
Ste 7th Floor
Brooklyn, NY 11201
718-254-6053
elliot.schachner@usdoj.gov

Michael James Wadden
Amy L. DeLine
Deborah S. Sohn
Trial Attorneys
U.S. Department of Justice
Civil Division
Consumer Protection Branch
P.O. Box 386
Washington, DC 20004
202-305-7133
michael.j.wadden@usdoj.gov
amy.l.deline@usdoj.gov
deborah.s.sohn@usdoj.gov

Amanda A. Rocque
David Moskowitz
Special Attorneys to the Attorney General
1801 California Street, Suite 1600
Denver, CO 80202
(303) 454-0100
amanda.rocque@usdoj.gov
david.moskowitz@usdoj.gov

*/s/ Catherine Wigglesworth*
Catherine Wigglesworth