UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Case No. 22-CV-05209-GJP |
| Plaintiff, | : | |
| | : | |
| vs. | : | Philadelphia, Pennsylvania |
| | : | April 11, 2025 |
| AMERISOURCEBERGEN CORPORATION, | : | 1:09 p.m. |
| AMERISOURCEBERGEN DRUG | : | |
| CORPORATION AND INTEGRATED | : | |
| COMMERCIALIZATION SOLUTIONS, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| . . . . . . . . . . . . . . . . . | : | |

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE GERALD J. PAPPERT
UNITED STATES DISTRICT COURT JUDGE

<u>APPEARANCES:</u>

| | |
|---|---|
| For the Plaintiff: | John Wesley Scott, Esq.<br>U.S. Attorney's Office<br>Civil Division<br>615 Chestnut Street, Suite 1250<br>Philadelphia, PA  19106 |
| For the Plaintiff: | Amy DeLine, Esq.<br>Department of Justice<br>Liberty Square Building<br>450 5th Street, N.W., Suite 6400<br>Washington, D.C. 20001 |
| For the Plaintiff: | Debra Sohn, Esq.<br>Department of Justice<br>Civil Division<br>450 5th Street NW<br>Washington, D.C.  20001 |

APPEARANCES: (Continued)


For the Defendants:                Abigail M. Swift, Esq.
                                   Joseph J. Mahady, Esq.
                                   Anne Bohnet, Esq.
                                   Robert A. Nicholas, Esq.
                                   Reed Smith LLP
                                   1717 Arch Street, Suite 3100
                                   Philadelphia, PA  19103


                                   Brian T. Himmel, Esq.
For the Defendants:                Reed Smith LLP
                                   225 Fifth Avenue
                                   Pittsburgh, PA  15222


                                   Katie Rolon
Court Recorder:                    Clerk's Office
                                   U.S. District Court


                                   Jessica B. Cahill, CER/CET-708
Transcription Service:             Maukele Transcribers, LLC
                                   467 Maukele Place
                                   Wailuku, Maui, HI  96793
                                   Telephone: (808)298-8633


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

```
1   APRIL 11, 2025                                      1:09 P.M.
2            THE COURT:  Okay.  Can't tell the players without a
3   program, but we have everyone's names.  I don't need to call the
4   roll, do I?
5            All right.  So kind of a curious set of circumstances
6   here.  First of all, I don't know why we couldn't have done this
7   over the phone, but you guys wanted to come in, so here we are.
8   I mean, I didn't have to travel very far.  But I have one side
9   saying we need a Special Master with a number of items that are
10  purportedly in dispute.  And then I have the other side saying we
11  don't need a Special Master; we really don't have anything left
12  to resolve.  So pardon my confusion.  Who wants to start?
13           MS. SWIFT:  Your Honor, Defendants are happy to start.
14  Abby Swift for Defendants, Your Honor.
15           THE COURT:  How are you?
16           MS. SWIFT:  I'm great.  How are you, Your Honor?
17           THE COURT:  Good, thank you.
18           MS. SWIFT:  We appreciate you doing this in person.
19           THE COURT:  Absolutely.
20           MS. SWIFT:  On a Friday, of course.  Defendants have
21  tried to work diligently with the Government.
22           THE COURT:  Not just work, work diligently.
23           MS. SWIFT:  Yes, work diligently for the last year plus
24  in discovery.  The parties have recently set up biweekly meet and
25  confers.  And while those have been somewhat helpful, we are
```

1    growing increasingly concerned with the number of outstanding

2    issues that the parties continue to have, the length of time it

3    takes the Government to provide their position on issues, and the

4    pace of the Government's productions.  I know we sent Your Honor

5    a list of outstanding disputes.  I'm happy to go through those in

6    more detail if it would be helpful.

7              THE COURT:  I think there may be time for that today.

8              MS. SWIFT:  Sure.

9              THE COURT:  Yes.

10             MS. SWIFT:  Sure.

11             THE COURT:  But not just yet.  Go ahead.

12             MS. SWIFT:  But at its core, Your Honor, we have a July

13   25th deadline to produce documents, that is less than four months

14   away.  Defendants have utilized Special Masters in other cases

15   similar to this one.  In the opioid litigation brought by cities,

16   states, counties.  We have found that those Special Masters have

17   been largely helpful for both sides to move the case along

18   efficiently.  And we think that's what we need here.

19             We've been going around and around with the Government

20   for months on many of these issues, and we need resolution, we

21   need finality.  And we do anticipate that more disputes will crop

22   up between now and the end of document production and between now

23   and the end of fact discovery.

24             THE COURT:  Understood.  You're sure you're just not

25   trying to get a different judge to look at this stuff?

1          MS. SWIFT:  We're sure.  We're sure.

2          Speaker B:  Given my prior rulings.

3          MS. SWIFT:  We're sure, Your Honor.  There are a number

4  of --

5          THE COURT:  No offense taken, by the way.

6          MS. SWIFT: No, no.  There are a number of issues that

7  we don't think rise to the level of --

8          THE COURT:  I get it.

9          MS. SWIFT:  -- a motion to compel.  We think it would

10  be much more useful to have informal meetings with a Special

11  Master or an independent third party for the parties to talk

12  things out, move things along.  If we do need formal briefing,

13  we've set a protocol for that, but we think a lot of this can be

14  handled informally.

15          THE COURT:  I appreciate that.  Thank you for your

16  assessment of things.  And this is my now 11th year.  I've only

17  appointed a Special Master once, and that was at my insistence

18  when I told both sides that I simply couldn't take it anymore.

19  And actually, it's worked well.  The litigation is longer

20  running, and there's more tentacles to it, believe it or not,

21  than this one.  So that's worked in that case.

22          But it's unusual -- well, once in 11 years, 10 plus

23  years, it's unusual for me to do that.  And when I told the

24  parties of my opinion, they promptly consented to the magistrate,

25  which, as you know, under Rule 53, unless the statute provides

1  otherwise, a court may appoint a master only; A) to perform

2  duties consented to by the parties.  It appears, at least to this

3  point, we don't have the other side's consent.  Whole trial

4  proceedings, et cetera.  Address -- and the other one that's

5  relevant here is address pretrial and post-trial matters that

6  cannot be effectively and timely addressed by an available

7  district judge or magistrate judge of the district.  I guess --

8  did I take too long to answer that one discovery dispute?

9            MS. SWIFT:  No, Your Honor.

10            THE COURT:  Oh, okay.  All right.  And I've never been

11  bright enough to farm this kind of stuff out to magistrate

12  judges.  I know my colleagues do.  I've just -- I'm kind of slow.

13  I just figure I'll do it.  So it is a bit unique.  I don't know

14  that absent consent, I really have yet seen the need for the

15  appointment of a master, though I know you've raised timeliness

16  concerns.

17            MS. SWIFT:  Yes.

18            THE COURT:  But look, happy to hear from the Government

19  who tells me, not surprisingly, everything you say is wrong and

20  everything is just great as far as they're concerned.  So why

21  don't you give me that optimistic report?

22            MR. SCOTT:  Thank you, Your Honor.  John Scott, on

23  behalf of the Government.

24            THE COURT:  Mr. Scott, good to see you.

25            MR. SCOTT:  Good to see you as well.  I think that as

1   we lay out in the letter that we submitted this morning, it's the

2   Government's position that a Special Master at this point is not

3   necessary and actually would potentially add an extra layer of

4   potential inefficiency to the process.

5           THE COURT:  There is -- excuse me, because --

6           MR. SCOTT:  Of course.

7           THE COURT:  -- you raised something I meant to raise

8   with Ms. Swift.  There is some merit to that, in my experience,

9   having the Special Master order the briefing.  And again, this is

10  -- this case redefines what it means to be a contested case.

11  There have been, over the course -- this has been going on for --

12  I'm in my eighth year of this litigation, this other case.  And

13  there's always then objections to the Special Masters.  Then that

14  comes to me, and then we have more briefing.

15          It does -- it can, when used in good faith, even,

16  lengthen the time for decision on these things, but I guess

17  that's part of what we'll talk about, too.  Go ahead.  I didn't

18  mean to interrupt you.

19          MR. SCOTT:  Sure.

20          THE COURT:  You just reminded me of something I thought

21  I had too.

22          MR. SCOTT:  Of course, Your Honor.  And quite frankly,

23  I think that that articulates the Government's position well.

24  The letter that was -- or the email that was submitted by Defense

25  counsel outlines a number of issues that have been the subject of

1    discussions between the parties at the every -- the biweekly meet

2    and confer that is currently, you know, proceeding every week.

3    Every two weeks, excuse me, in addition to individual, you know,

4    smaller breakout groups discussing, you know, other issues as

5    they've come up.  We're happy to go through the list, if that's

6    what Your Honor would like.

7         THE COURT:  Yeah, I mean, look, we're all here.  I

8    think we can.  If there's anything I can do while we're all here

9    to resolve any of these things or move things along more quickly.

10        Candidly, the one part of the Defendants -- the one

11   aspect of the Defendants concerns with which, you know, I am

12   mindful of and do need some answers from the Government on is, at

13   least according to the Defendant, the pace of production, and not

14   the Defense's word, I'll use the delays in getting them what

15   they've asked for, particularly given, you know, the current

16   deadlines.

17        So is that better addressed in the context of the

18   individual issues that you've laid out or?

19        MR. SCOTT:  You know, Your Honor, I think as to

20   production issues, I think my colleague, Amy DeLine probably is

21   better to speak to that.  But what I can say, just in general, is

22   that, again, this has been something that has been discussed.

23   From the Government's perspective, we've committed resources to

24   this.  We are pushing this along as quickly as possible.

25        THE COURT:  Hold on.  You've committed resources to

1    this?

2              MR. SCOTT:  Yes, Your Honor.

3              THE COURT:  Do you want extra credit for that?  I mean,

4    you brought the case.

5              MR. SCOTT:  Of course, Your Honor.

6              THE COURT:  Okay.

7              MR. SCOTT:  The point being is that this is something

8    that has been discussed at the meet and confer process.  We are

9    moving it along as we are able to.  And, again, as I pointed out

10   initially, adding an additional layer of briefing and potential

11   argument to that would not necessarily have resulted in

12   efficiency.

13             THE COURT:  Well, there's a way to -- there is a way to

14   -- there's a way to shortcut all that, and that's just give them

15   what they've asked for in a timely manner.

16             MR. SCOTT:  We have been making -- and again, my

17   colleague can set out in detail kind of the number of

18   productions.  I know that we've made at least 20 productions over

19   the past year.  We're getting them out expeditiously.  I think

20   that we were supposed to have a production that was supposed to

21   go out today.  We are producing documents as --

22             THE COURT:  Is that more than a coincidence that it's

23   going out today, the same day we're having the hearing?

24             MR. SCOTT:  It shouldn't -- it's not, Your Honor.  It's

25   because they have been going out at a regular interval.

```
 1              THE COURT:  Okay.  Look, please, both of you may sit
 2    down if you want, or stay standing, whatever you want.  Look,
 3    I've gone over the list of outstanding disputes and, obviously,
 4    individually, these are all pretty minor things and things that I
 5    deal with conceptually in cases big and small, right.  Inadequate
 6    interrogatory responses.  They haven't given us the documents
 7    yet.  You know, all pretty basic stuff that doesn't -- I mean, if
 8    these are the issues here, my immediate take on this is nothing
 9    here is really Special Master worthy.
10              But, you know, I know you're concerned about other
11    stuff coming down the pike, and maybe that'll happen, maybe it
12    won't.  But why don't we just go through the list and see if
13    there's anything I can't do to, at least on a micro level,
14    address some of the Defendants' concerns?
15              So, Ms. Swift, identification of custodians.  I'm not
16    real sure I fully understand that one.
17              MS. SWIFT:  Yes, Your Honor.  So custodial files are,
18    in a lot of ways, the foundation of document production.  If we
19    don't have the right people --
20              THE COURT:  Did you say custodial files?
21              MS. SWIFT:  Custodial files.  So individual --
22              THE COURT:  So what does that mean in this context?
23              MS. SWIFT:  Individuals who worked at the DEA,
24    currently or previously, who would have relevant responsive
25    information.  The Government needs to search their email folders,
```

1   their shared drives on their laptops, the like -- but mostly,

2   when we say custodial files, we're talking about emails and

3   attachments to emails.

4           THE COURT:  From the appropriate people within the --

5           MS. SWIFT:  Yes.

6           THE COURT:  Which I have to imagine is a fairly common

7   discovery process in Governmental litigation, right?

8           MS. SWIFT:  Yes.

9           THE COURT:  Okay.

10          MS. SWIFT:  Yes.

11          THE COURT:  Okay.  So Defendants have concerns about

12  the Government's identification of relevant document custodians.

13  The Government has agreed that communications with and about

14  Defendants and communicated are relevant and responsive.  Okay.

15  However, the Government has declined to identify individuals from

16  the DEA, namely the Regulatory Section, who communicated with

17  Defendants and relevant third parties, and has instead

18  represented this group is not an external facing group.

19          Okay.  Now let me stop there.  And I remember one of

20  the bases for the prior ruling was that, look, the stuff that the

21  agency folks are telling third parties and others is all fair

22  game for discovery, right?  It was the internal musings of staff

23  and others.

24          So, Mr. Scott, how do you respond to this?  And how

25  many custodians, ma'am, are we talking about?  Do you even know,

1    or if they haven't identified anybody, or do you know who they

2    are, but they just won't give you their stuff?

3            MS. SWIFT:  We know some of them, Your Honor.  So the

4    Government has agreed to a number of custodians.  Most of them

5    are diversion investigators in the field, they're not at DEA

6    Headquarters.  They've only agreed to 21 individuals at DEA

7    Headquarters and a lot of those have been at Defendants'

8    insistence.  When we said --

9            THE COURT:  And then how many diversion folks?

10           MS. SWIFT:  I believe it's somewhere in the 80s, Your

11   Honor.  It's a total of 109 custodians.

12           THE COURT:  Okay.  So 88.  You called them diversion --

13           MS. SWIFT:  Diversion investigators.

14           THE COURT:  -- investigators.

15           MS. SWIFT:  And those are individuals that the

16   Government identified.

17           THE COURT:  Right.  So are you okay with the custodians

18   that have been identified that fall under the heading of

19   diversion investigators?

20           MS. SWIFT:  So far, Your Honor, yes.

21           THE COURT:  That's not where the current problem is.

22           MS. SWIFT:  That's not where the current problem is.

23   Although we reserve rights if we find something.

24           THE COURT:  You reserve the right to complain about

25   anything.

1          MS. SWIFT:  Yes.

2          THE COURT:  I get it, I get it, I get it.  And so far,

3    other than the diversion investigators, whether they've given the

4    names to you willingly or whether you've had them drag along

5    kicking and screaming to give them to you, you have the names of

6    21 individuals at DEA Headquarters?

7          MS. SWIFT:  At DEA Headquarters, yes.

8          THE COURT:  Okay.  Is the issue that you believe there

9    should be more individuals named within the DEA or that you're

10   okay with those 21 individuals, at least for now, but you haven't

11   received their stuff?

12         MS. SWIFT:  It's both, Your Honor, actually.

13         THE COURT:  Okay.

14         MS. SWIFT:  So the first issue is that we do believe

15   there are additional individuals who have communicated with and

16   about Defendants and their reporting obligations and with

17   relevant third parties, like the industry group and like other

18   registrants.  We were being told by the Government that this

19   Regulatory Section, for example, is not external facing.  It's an

20   internal facing group.  The Regulatory Drafting Section, same

21   thing.  It's internal facing.

22         THE COURT:  So internal facing, as I'm understanding it

23   would mean that would then fall under my heading of the internal

24   stuff that they can't give you.

25         MS. SWIFT:  Exactly.

1          THE COURT:  External facing should be the people who

2   are communicating with others, which we've said is okay for you

3   to receive.

4          MS. SWIFT:  Exactly, Your Honor.

5          THE COURT:  Okay.

6          MS. SWIFT:  And we since discovered that there were

7   individuals in both of those groups that communicated directly

8   with Defendants.  There were individuals giving us presentations,

9   emailing our Diversion Control employees, saying, looking forward

10  to working together.

11         THE COURT:  So, you know, there are names of folks

12  there that are not -- that would have relevant materials that are

13  not within the 21?

14         MS. SWIFT:  Yes, Your Honor.  And to be clear, the

15  Government has agreed to add some of the ones that we have

16  identified.  The problem is we're not confident that they have

17  the right people.  And if they don't have the right people --

18  like, we don't know who communicated with other registrants or

19  with an industry group.

20         THE COURT:  Well, wouldn't that be a subject of

21  depositions for some or -- you know, the people higher up the

22  pecking order within the 21 internally that you've been given so

23  that you can find out, or do you have interrogatory responses

24  asking who were the -- list all names of the people who

25  communicated with, you know, your clients, et al?

1          MS. SWIFT:  Your Honor, in terms of the deposition, it

2     very well may be that we ask people at depositions.

3     Unfortunately, at that time, it's probably going to be too late.

4     Document production ends in less than four months, and we don't

5     want to take those depositions without having the files of those

6     individuals, which we're not getting.  So I think that's the

7     first thing.

8          THE COURT:  Okay.  So do you have any handle on -- so

9     we have 21 people that you know about that they've identified for

10    you, excuse me.  You haven't gotten their stuff?

11         MS. SWIFT:  Yes.

12         THE COURT:  And then there are an untold number of

13    others in addition to the 21 that you know or suspect should be

14    in the group that they've identified but aren't?

15         MS. SWIFT:  Yes, Your Honor.

16         THE COURT:  And, obviously, you haven't gotten their

17    stuff either.

18         MS. SWIFT:  Yes, Your Honor.

19         THE COURT:  How many, in addition to the 21 that have

20    been named, would you think might be people who are relevant, who

21    would have relevant information?

22         MS. SWIFT:  I'm not sure of a number.  If I had to

23    ballpark it, I'd probably say anywhere between five to 10.  But

24    I'm not sure because we don't know what we don't know.  We don't

25    have access to who DEA was communicating with from other

1    registrants or with industry groups.  We only have a very limited

2    window into who (indiscernible) their communications with us.  So

3    we are concerned that -- you know, the Government's represented

4    to us and to the Court that they would give us these

5    communications, but if they're not searching the right files,

6    we're not going to get those communications.

7            THE COURT:  And again, these are all people who

8    indisputably have communicated with you or others similarly

9    situated on issues of relevance to the case?

10           MS. SWIFT:  Yes, Your Honor.

11           THE COURT:  Okay.

12           MR. SCOTT:  Your Honor, I think as to this particular

13   issue, my colleague, Amy DeLine is probably better at addressing

14   the substance.

15           THE COURT:  Okay.  Ma'am, how are you?

16           MS. DELINE:  Good.  How are you, Your Honor?

17           THE COURT:  Good.

18           MS. DELINE:  So let's talk -- I'll go over custodians,

19   but I want to sort of back up a little bit and talk about pace

20   because I think there's a few issues here that are floating

21   around.

22           So our discovery, as you would imagine, is quite broad

23   from Defendants and from DEA.  There are sort of two buckets of

24   it.  There's the stuff related to the customers, to Defendants

25   customers for whom we're saying Defendants failed to support --

1  report suspicious orders to DEA.  So there's this sort of

2  customer discovery bucket, and then there's everything else from

3  DEA, including communications with Defendants, communication --

4  other external communications.

5          In both buckets, there are custodial files, which Ms.

6  Pierce has addressed.  There are also investigative files from

7  DEA.  We have been working with Defendants to work through these

8  different categories of documents.  I will say we have started

9  our productions with the investigative files.  Investigative

10 files are, quite frankly, what they sound like.  They're

11 investigative files, right?

12         They're the DEA's central store of all of the memos,

13 all of the communications, all of the exhibits.  The file for an

14 audit, an investigation, an inspection of a registrant.  That

15 would be of Defendants.  It would be of their customers.  And

16 those files, as you can imagine, are incredibly dense.  They

17 include reports of investigation written by the diversion

18 investigators.  They include exhibits.  They include internal

19 memos.  They include all hundreds -- you know --

20         THE COURT:  All relevant stuff.

21         MS. DELINE:  All relevant stuff, all of which we need

22 to produce.  Early on in discovery, we worked with Defendants to

23 come up with a discovery plan, both for the customer discovery

24 piece of it and the non-customer sort of all the other stuff.

25 Early in those conversations, they asked for investigative files.

1    They asked that we prioritize investigative files.  They asked

2    that we prioritize investigative files for their -- for

3    Defendants and for customers for whom we allege diversion was

4    actually -- we know diversion was occurring.

5            So that's what we did.  We prioritized these

6    investigative files.  Again, they are incredibly dense.  It's not

7    like reviewing emails.  It's not like reviewing an attachment.

8    They can be a few pages.  They can be hundreds of pages.  They

9    can be memos that are three pages long.  They can be memos that

10   are 20 pages long.  And they all include various kinds of

11   potentially privileged information, right.

12           So they're law enforcement files, so they may have

13   executive privilege implicated by them.  They have attorney-

14   client privileged information in them.  They have work product

15   Information in them.  They have information -- grand jury

16   information.  They have Bank Secrecy Act protected information.

17   They have information protected under state law.  Excuse me.

18   There's any number of privileges and protections implicated by

19   these investigative files, which is all to say they're difficult

20   to review, they're difficult to produce.

21           We have been working on them.  We've produced, I think,

22   somewhere around 500 case files so far.

23           THE COURT:  How many people you have working on this

24   stuff?

25           MS. DELINE:  It depends, because we have some people

1   working on these files and we have some people working on

2   custodial files because Defendants ask that we dual track, so we

3   are dual tracking.  I think we have a team of about 30.  But

4   these investigative files are awful to review and produce.

5   We've --

6            THE COURT:  Let me stop here.

7            MS. DELINE:  Sure.

8            THE COURT:  I respect the practical realities of

9   governmental files --

10           MS. DELINE:  Sure.

11           THE COURT:  -- and the Government's love of memos.  All

12   right.  But look, the Government, after a lengthy period of time

13   and deliberation and with other cases as the model, decided to

14   bring this case.  So the difficulties that the Government has in

15   collecting and producing indisputably relevant discovery

16   materials is not something I'm going to have much sympathy

17   toward.  And that's not to diminish the efforts of you and the 30

18   folks behind you.  But --

19           MS. DELINE:  Understood, Your Honor.  This is all just

20   to say we have been focused on getting those out.  We've made 20

21   productions of --

22           THE COURT:  How long has this process been going on?

23   When were these documents first requested?

24           MS. SWIFT:  Your Honor, we sent our first RFPs, I

25   believe, in August of 2023, maybe even earlier than that.  This

1    process has been going on for a very, very long time.  And to be

2    clear, Defendants' position, and we told the Government this, is

3    that they've always needed to multi-track this.  We've never told

4    them to get us certain files, you know, and put everything else

5    on the back burner.  In fact, the very files that Ms. DeLine is

6    talking about, we were told we would get those and they would be

7    done with them in December.  It is mid-April.  We just received

8    our very first production of custodial files, so emails, last

9    week after this Court set this status conference.

10          THE COURT:  It's amazing the cause and effect there is.

11          MS. SWIFT:  It is.  It is.

12          THE COURT:  And I see that all the time.  I don't know

13    what we're doing here, Judge, we gave them everything they asked

14    for.

15          THE COURT:  When did you do that?  We emailed it this

16    morning.

17          MS. SWIFT:  Yeah.

18          THE COURT:  I had one of those last week.  I hear you.

19          MS. DELINE:  Your Honor, I am not making excuses for

20    the Government.  I am simply saying as an --

21          THE COURT:  I know you're not.  I think what I'm saying

22    is I wouldn't give it any weight anyway.

23          MS. DELINE:  Yeah.  So to be clear, Your Honor, we

24    didn't have our Rule 16(f) conference in this Court until January

25    of 2024.  So productions started after that.

1           THE COURT:  Well, that's 15 months.

2           MS. DELINE:  And we have produced roughly 400,000 pages

3    of files.  Defendants have produced roughly 500,000 pages.  It's

4    not like we're on very different footing here.  I am only saying

5    that in advance of getting to your question about custodians, we

6    have been producing documents.  We're not in such different

7    positions.  We expected these investigative files to be

8    incredibly burdensome.  They are.  We are obligated to produce

9    them.  We are producing them.  It is moving along at the pace we

10   expected.  We committed to getting them a subset by December --

11          THE COURT:  I think -- let's focus on at the pace we

12   expected.  Who's the we?

13          MS. DELINE:  The Government as shared with Defendants.

14   We have always said to them these files would take a long time.

15   We would need a learning curve to get our team ramped up and get

16   them out.  Our productions would start small and get bigger.

17   That has all happened.  We produced roughly 10,000 pages last

18   week.  We produced another production this week.  I expect we

19   will have another production going out next week.

20          So it -- while there is some coincidence to us being in

21   the court and us getting these files out, it is merely

22   coincidence.  We are making productions every two to three weeks.

23          THE COURT:  How about the custodian issue?

24          MS. DELINE:  Yes.

25          THE COURT:  The people.  How many people?  How many

1    custodians?  You know, they're saying that, hey, we know there's

2    others out there because we have their names because we dealt

3    with them, and they're not listed.  And how many other custodians

4    do you reasonably think we're going to be dealing with?  And how

5    much more will that entail?

6           MS. DELINE:  So we have roughly 110 to 120 custodians

7    to whom we've agreed.  It includes about 90 diversion

8    investigators who, as Ms. Pierce said, interact in the field.

9    They are the people interacting, having conversations directly

10   with registrants.

11          THE COURT:  Right.

12          MS. DELINE:  Makes sense that we would include them.

13   There are then -- so that's the --

14          THE COURT:  And that's not the issue or the problem

15   right now.

16          MS. DELINE:  That's not the issue or problem.  That is

17   -- but those are the people we know are interacting with

18   Defendants or other registrants or customers.  And so we have --

19   we offered to produce them back in April of last year.  We are

20   committed to producing them.  We're working through their files.

21          There are then -- there's the diversion control group

22   at DEA headquarters.  It's a relatively small group.  Last April,

23   we proposed to give them for our relevant time period, the

24   assistant administrator who sits over that group for the entire

25   time period.  I don't know how many people that is, five or six.

```
 1          We then proposed to give them, and they agreed, all of

 2   the section heads for the sections that we understand would have

 3   relevant materials.  That includes, in particular, the liaison

 4   and policy sections.  Those are the sections responsible for

 5   giving guidance and information to registrants, including

 6   Defendants.

 7          THE COURT:  And everybody you're talking about are

 8   already within the 21 or so --

 9          MS. DELINE:  Yes.  Yes.

10          THE COURT:  -- that have been identified?

11          MS. DELINE:  Yes.

12          THE COURT:  And Ms. Swift thinks, and she doesn't know

13   what she doesn't know, there's maybe five to ten more people who

14   would match the definition of what she's concerned about.  And

15   that seems to line up with your number if you're talking 120 to

16   130, and 90 of them are diversionary people, right?  So that's --

17          MS. DELINE:  So I think there are two different

18   regulatory groups that Ms. Swift has mentioned.  One is the

19   Regulatory Section, which they are particularly focused on.  That

20   is, and internal facing group.  The folks in that section

21   coordinate with the field offices.  They run deconfliction

22   checks.  They make sure that the offices --

23          THE COURT:  Is there anyone who you are defining as

24   internal facing who would possess information that is relevant

25   and discoverable, yet consistent with my prior decision?
```

1          MS. DELINE:  So, Your Honor, we understand that the

2  Regulatory Section is primarily internal facing.  I can't rule

3  out that folks there didn't have some external communications

4  here and there, but it's not the bulk of their or the focus of

5  their responsibilities.

6          In December, Defendants came to us and said, hey,

7  here's a list of eight or nine additional custodians, could you

8  consider adding them?  We added from that list two people from

9  this Regulatory Section who they suggested had external facing

10  communications.  We looked into it.  They had a few.  I wouldn't

11  say it rises to the level of it being a regular portion of their

12  jobs.  I don't know.  But based on what we saw, we thought, okay,

13  let's give them these.  We'll compromise.  I'm not sure we would

14  agree that they're discoverable, but we'll compromise.  We'll

15  give you these, too.

16          They then came back recently, I think, in March and

17  said, hey, here's two more people we think you need to give us.

18  These two additional folks are staff coordinators.  Their job is

19  literally coordinating for everyone else in the office.  Ms.

20  Swift sent us an example email that included these two staff

21  coordinators.  It also included two other custodians who we've

22  already agreed to give them.

23          We then have -- however, because they asked for them,

24  we said, okay, let's look into what their job was.  Were they

25  external facing?  Were they having internal conversations about

1  Defendants?  Were they having regular or any substantive

2  conversations with Defendants?  We talked to the folks, we talked

3  to other people in the group and they said no, they're staff

4  coordinators.  They wouldn't have substantive communications with

5  Defendants.

6          THE COURT:  Let me ask you this.

7          MS. DELINE:  And just to finish this --

8          THE COURT:  Let me ask you this.

9          MS. DELINE:  Sure.

10          THE COURT:  The concern is that there are an unknown

11  number of other people who may be appropriate, who may have --

12  may be custodians of relevant and discoverable information.

13  Counsel is guessing --

14          MS. DELINE:  Sure.

15          THE COURT:  -- five to ten.  That's her ballpark.  No

16  one's holding her to it.

17          MS. DELINE:  Sure.

18          THE COURT:  What about those people?  That seems to be

19  the issue in addition to the pace of things which you've

20  addressed.

21          MS. DELINE:  Your Honor, I think the couple of folks

22  that she's -- that Ms. Pierce has brought to us out of -- well,

23  let's say she's brought us five folks from this regulatory group.

24  We've added two, we've said two don't have substantive

25  communications.  But because you've identified these other two,

1  we are still looking into this.  It is -- I think we've been

2  having this conversation for a month, month and a half.  It's a

3  10-year period.  The folks at DEA Headquarters transition in and

4  out significantly or, you know, pretty frequently.  The

5  responsibilities of the sections have changed over time.

6        So as part of our meet and confer process, we have been

7  investigating whether or not there's anyone else that we should

8  add.

9        THE COURT:  So you're not saying they're giving you the

10  Heisman yet, right?  You just don't have this stuff.

11        MS. SWIFT:  Your Honor, I actually -- I think they are.

12  I mean, I think, here's the problem.  We go to them in December

13  and say, we think these people would have relevant information.

14  Please add them.  They say no.  They didn't say yes.  They said

15  no.  And we said, here are some documents that show they had

16  direct communication with us and only then did they agree to add

17  a couple of those individuals.  And they continue to tell us that

18  group is not external facing.

19        But if that group is not external facing, why are they

20  giving us presentations on the regulation?  Why are they coming

21  to us and saying, you know, looking forward to collaborating and

22  working with you?  It's just not adding up.  And we're not

23  getting a -- we're not -- we're not getting anywhere with the

24  Government on these meeting confers.  We're met with, well, we're

25  told that this -- that that group, despite the documents you

1   showed us, that's not what they do.  We don't know why those

2   documents are out there, but that's not what they do.  We're

3   going to -- you know, maybe we'll look into it, maybe we won't.

4   But like I said, we've been.  We've been going around and around

5   on this since December.  Document production ends in less than

6   four months, we need finality.

7           THE COURT:  Oh, I'm sorry.

8           MS. SWIFT:  No, no, I'm sorry Your Honor.

9           THE COURT:  Wait a minute.  She called you Ms. Pierce.

10  I called you Ms. Swift.

11          MS. SWIFT:  Yes, Your Honor.

12          THE COURT:  Who's right?

13          MS. SWIFT:  You are both technically right.  Pierce is

14  my maiden name.

15          THE COURT:  Okay.

16          MS. SWIFT:  Swift is my married name.

17          THE COURT:  What do you go by?

18          MS. SWIFT:  Swift.

19          THE COURT:  Okay.

20          MS. SWIFT:  Thank you.

21          THE COURT:  Yeah.  Because in your email it says

22  Pierce.

23          MS. SWIFT:  Yeah, I'm in the middle of changing over.

24          THE COURT:  Very good.  Well, congratulations.

25          MS. SWIFT:  Thank you.

```
 1              THE COURT:  All right.  You're Ms. Swift from

 2   Henceforward.  So, look, Ms. Swift, the first bullet point ends

 3   with, the Government still will not identify a list of

 4   individuals at DEA who communicated with and about Defendants and

 5   communicated with relevant third parties or confirmed that all

 6   such individuals are custodians.  At the end of the day, that's

 7   what you want here, right?

 8              MS. SWIFT:  Yes.

 9              THE COURT:  I mean, as a first step anyway?

10              MS. SWIFT:  Yes, that's what we want.

11              THE COURT:  So, Ms. DeLine, that's the issue for the

12   Court today.  Where is -- they would like a list of individuals

13   at DEA, which is apparently going to be names on top of the 21

14   they already have, who communicated with and about, et cetera,

15   relevant third parties.  Can you give them that list?

16              MS. DELINE:  Your Honor, we have given the names to

17   them of the folks of which we are aware, they are custodians.  We

18   have added custodians.

19              THE COURT:  But they've said there's names they don't

20   have that they know have communicated with them.

21              MS. DELINE:  The two --

22              THE COURT:  I mean, this isn't Special Master worthy.

23   I'm wondering if it's -- I mean, Jack, you want to handle this?

24   And this isn't hard.  This isn't hard.  It's like --

25              MS. DELINE:  Your Honor --
```

1              THE COURT:  -- I don't want to oversimplify, you know,

2    a serious issue.  But what's it going to take you to determine

3    who had communications with Defendants and relevant third parties

4    on relevant topics?

5              MS. DELINE:  Your Honor, we are working on it is all --

6    we have given them some names.

7              THE COURT:  When will you --

8              MS. DELINE:  I think we have an additional name for our

9    bi-weekly meet and confirm next week.  We have identified another

10   central file store of external facing communications.  I guess my

11   point is we are meeting and conferring as we are supposed to do.

12   The process is working well.  We are attempting --

13             THE COURT:  Yeah, I hear you and I -- hey, you're doing

14   a lot of work.  I don't mean to apply you're not.  I get it.  But

15   the process may be working, but it's not working fast enough for

16   the Defendants and kind of for me too.  It's not working fast

17   enough.  So can you add people to the team?

18             MS. DELINE:  Your Honor, I don't have perfect knowledge

19   of what's happened.

20             THE COURT:  How about imperfect knowledge?

21             MS. DELINE:  I have -- which they have.  The folks of

22   whom.

23             THE COURT:  No.  Can you add to the team, the 30

24   people?  Can you take it to 40 or 50?

25             MS. DELINE:  I don't know.  I am not in control of how

1    Government resources are allocated, so I don't know.

2         THE COURT:  Should I call Elon directly?

3         MS. DELINE:  I will say, Your Honor, we have identified

4    the folks at headquarters as they, through the meet and confer

5    process say, here's someone else.  Can you look into it?  We do.

6    We then have expanded on that to make sure we are getting them --

7         THE COURT:  Okay.

8         MS. DELINE:  -- sort of consistent with our Rule 26

9    obligations, the folks who are going to have communications.

10        THE COURT:  Look, I hear you, I hear you, I hear you.

11   And July 25th isn't tomorrow, but it will come around pretty

12   quickly.  And what would you like to take from this discussion?

13   What would you like from me?

14        MS. SWIFT:  Yes, Your Honor.  We would like a date

15   certain by which the Government must provide us a list -- an

16   exhaustive list of everyone at DEA Headquarters who had

17   communications with or about Defendants and with or about other

18   registrants and relevant third parties like the industry groups.

19        THE COURT:  What would you like that date to be?

20        MS. SWIFT:  I would like that date to be two weeks from

21   now, Your Honor.  I think that's fair.  We've been asking for

22   this for a really long time, and we're running out of time

23   because once we have that information, they need to add those

24   custodians, review them and produce them before the end of July.

25        THE COURT:  So you'll get them a list of those people

1    within two weeks?

2            MS. DELINE:  Your Honor, the -- I don't know that that

3    list is possible.  We have identified for them the folks we know

4    had communications with Defendants.  As we identify new folks,

5    we're telling them.  I also don't think it is our obligation

6    under Rule 26 to identify everyone at DEA that may have ever had

7    a communication with Defendant or someone else.  That's not --

8            THE COURT:  Well, I didn't take the request to be that

9    limited.  Maybe that's how it's been pitched to you.  And I agree

10   that that would be overbroad.  And that's, I don't think, what

11   the Defendants are seeking.  They seem to have in mind people

12   that were more regularly communicating with either them,

13   registrants or third parties.

14           MS. DELINE:  Which we have identified, Your Honor.

15           THE COURT:  So how would you word it?  Who've

16   communicated -- they say who communicated with.  Who regularly

17   communicated with.  Who communicated as part of their job, their

18   duties and responsibilities.  Because we do have to have some

19   limiting principles here.

20           MS. SWIFT:  Yes, Your Honor, I appreciate that.  I

21   think the thing that would concern us though is the Government

22   has taken this view that if a department has -- this is their

23   primary function, they do this.  But maybe 30 percent of the time

24   they communicate with registrants; they're going to tell us

25   that's not regular and they don't have to identify that person.

1              THE COURT:  That's regular.  Thirty percent is enough.

2              MS. DELINE:  That is not -- we have never thrown out a

3    30 percent.  What we are talking about, to be clear, is Ms. Swift

4    just identified a single email about a meeting that in fact never

5    actually happened and already has two other custodians who we've

6    promised to give them on it.  So we're talking about one, a

7    meeting that never happened.  So in an email communication about

8    scheduling that meeting.  And it's being blown into this -- it's

9    the tail wagging the dog, right.

10             So we have looked into it.  We have identified an

11   additional trove of shared file of extra external communications

12   that we are going to produce to them.  We have identified the

13   groups that as 70 percent, 80 percent, whatever the percentage

14   is, are the external facing groups, in this particular section

15   that we are talking about.

16             We are looking at it to see if there are other folks

17   who had external non-duplicative communications with Defendants.

18   We are still working on it.  We started working on this in March

19   when they brought the issue to us.  It's not been that long.

20   It's been a month.  And we've been working on it and we are

21   pushing it forward.

22             I just -- my takeaway from this, Your Honor, is we are

23   meeting and conferring.  I understand that Defendants would like

24   things to move faster, but while we are addressing this, we are

25   continuing to produce documents.

1          THE COURT:  I understand.

2          MS. DELINE:  We are continuing to get stuff out the

3   door.  So I --

4          THE COURT:  I understand.

5          MS. DELINE:  -- you know, I guess the last thing I will

6   say on this is we agreed to custodians a year ago, and now in

7   March of this year, they're saying a month is too long of a

8   delay.  Well, from April until March of this year or even

9   December of last year, that was a very long a number of months

10  when it wasn't urgent for Defendants and now it is.

11         THE COURT:  I'll tell you what, let me word something

12  that's appropriate, tries to strike the right balance and

13  obligates the Government to give them the best list you can give

14  them by the end of the month.  That's April 31.

15         MS. DELINE:  Okay.

16         THE COURT:  Three weeks.

17         MS. DELINE:  Sure.

18         THE COURT:  Is that right?  Yeah.  All right.  Okay.

19         Interrogatory responses.  Defendants believe that a

20  number of the Government's interrogatory responses are deficient

21  and inadequate for several reasons, including the Government's

22  repeated invocation of Federal Rule of Civil Procedure 33(d).

23  Hang on a minute.  Oh, yeah, the old option to produce business

24  records gag.  All right.  Yeah, I got that.  It is a recognized

25  rule.

 1          All right.  Without identifying documents with any

 2   specificity at all and the Government's failure to provide basic

 3   information like -- okay.  How broad a problem are we talking

 4   about here?  How many interrogatory responses?

 5          MS. SWIFT:  Pretty broad.  Your Honor, it's 16

 6   interrogatory responses that the Government has used this for.

 7          THE COURT:  Sixteen.

 8          THE COURT:  And what have been the nature of the

 9   interrogatories?

10          MS. SWIFT:  A lot of them ask them to identify

11   communications -- specific communications with Defendants about

12   -- for example, one of the issues in this case is the method of a

13   dual trigger in Defendants suspicious order monitoring system.

14   We say identify every time you communicated with Defendants about

15   the dual trigger system.  And they say that might be in some

16   documents that we may have already given you or that we will at

17   some point in the unknown future give you.  And those may or may

18   not be contained in some form of a custodial file.

19          THE COURT:  Well, that's not the specificity that the

20   rule requires.

21          MS. SWIFT:  Certainly not, Your Honor.

22          THE COURT:  So if the Government is going to use Rule

23   33(d) to respond, and I can see in a case like this where that

24   could be an appropriate option under the rules, the Government is

25   obligated to specify the records that must be reviewed in

1    sufficient detail to enable the interrogating party to locate and

2    identify the them and give the interrogating party a reasonable

3    opportunity to examine and audit the records, et cetera.  Well,

4    two, will get taken care of in discovery.  But if you want to

5    rely on 33(d), you have to be specific.  Has that been the case?

6           MS. SOHN:  Your Honor, I'll be addressing this one.  I

7    guess I want to start by emphasizing the breadth of the

8    interrogatories that have been propounded --

9           THE COURT:  And, you know, I'm a little bit --

10   obviously, nobody filed a motion.  I'm trying to be helpful.  I

11   don't have anything in front of me.  I don't have the specific

12   interrogatories.  Interrogatories are, in my opinion, relatively

13   useless and, you know, do a lot to slow up discovery and

14   litigation.  The questions are, and I haven't seen yours, so this

15   does not apply to the Defendants.  But gee whiz, these questions,

16   these issues that I resolve, the interrogatories are just

17   ridiculously overbroad --

18          MS. SOHN:  Yes.

19          THE COURT:  -- and, as a practical matter, impossible

20   for anybody to comply with.  I'm not saying that's what they've

21   done.  You probably will, and I can't agree with you or not,

22   because I don't have them in front of me.  But what is the

23   problem?  And you know, if you're going to use 33(d), why can't

24   you be more specific in what you're referring them to?  Because

25   the interrogatory is too broad.

1          MS. SOHN:  Your Honor, the interrogatories are

2     incredibly broad.  They essentially ask for every communication

3     between DEA and Defendants over an unspecified time period on a

4     number of topics.

5          THE COURT:  Okay.  Stop right there.  If that's true,

6     that is overbroad.

7          MS. SOHN:  Yes.  And I would like to highlight also

8     that it's communication between the Government and Defendants.

9     So these are communication that Defendants presumably have as

10    well or are aware of.  So it's -- as an initial matter, it's a

11    little unclear why they need to propound rogs on the Government,

12    asking us to essentially create a log of communications that the

13    Government had with Defendants.

14          And as Ms. DeLine talked about, there were dozens of

15    DEA employees over the 10-year time period that were

16    communicating with Defendants.  So in our -- we think, initially,

17    that the interrogatories are incredibly overbroad.  And like I

18    said, they're unduly burdensome because they already have the

19    relevant communications.  That being said, we did our best to

20    identify where we think these communications -- what exists.  We,

21    me standing here, I don't know if these -- if some of these

22    communications even exist.  I can tell you where we believe --

23          THE COURT:  Where they would be if they did.

24          MS. SOHN:  Yes.  And it's what we gave them.  We gave

25    them the investigative files of the DIs that were working with

1  Defendants.  We gave them the names of the custodians that -- or

2  the custodial files where -- you know, these are the people that

3  we understand are communicating with Defendants.  But this is not

4  the Government, like, not wanting to do its work.  Like we -- in

5  order for me to put together a list of the communications, I

6  would have to review all the documents that I've redirected

7  Defendants to and create a list.

8          THE COURT:  Do you have one of these interrogatories

9  with you?

10          MS. SWIFT:  Yes, Your Honor.  I'm happy to bring it up,

11  Your Honor, or just read it.

12          THE COURT:  It's hard for me to read it from here.  A

13  couple years ago, maybe, but my eyes have changed.  No, I'll look

14  at it, Ms. Swift, and, obviously, I'll hand it right back to you.

15          MS. SWIFT:  Okay.  May I approach, Your Honor?

16          THE COURT:  Yes, please.

17          MS. SWIFT:  All right.  And I apologize, this copy has

18  a couple highlights on it.

19          THE COURT:  Anything you don't want me to see?

20          MS. SWIFT:  Nothing I don't want you to see.

21          THE COURT:  All right.  Okay.

22          THE COURT:  Wow.  You really think that about her?

23  Okay.  All right.  So the -- where's the interrogatory

24  themselves?  Okay.  Which ones would be in dispute, Ms. Swift?

25  Do you know now that I have your copy?

1          MS. SWIFT:  Yes, Your Honor.  Actually, this entire set

2     is currently in dispute.  The Government has not answered any of

3     them.

4          THE COURT:  That's what I was afraid you were going to

5     say.  Right.

6          MS. SWIFT:  However, interrogatories 20 through 26 of

7     this set are the interrogatories that the Government invoked Rule

8     33(d) to answer.

9          THE COURT:  Oh, double-sided.  Okay.  All right.  All

10    right, 20.  Okay.  Identify every instance where you, meaning our

11    great Government, communicated to AmerisourceBergen regarding

12    dual trigger mechanism, et cetera.  For each instance, provide

13    the date of communication, the type of communication, the

14    substance of communication.

15         I understand and respect why you want this.  That

16    interrogatory is nothing I would respond to if I were a

17    practicing lawyer.  Every instance where you, the Government,

18    communicated to Amerisource, I can't expect people to respond to

19    that.  The appropriate answer to that is to direct you to the

20    documents they're producing.

21         MS. SWIFT:  Yes, Your Honor.  I think the problem is,

22    though, the case law requires more if you're going to -- if

23    you're going to point us to the documents.  There's case law to

24    support --

25         THE COURT:  Well, the rule does too, right?  More

1    specificity.

2          MS. SWIFT:  Yeah.  Yeah.

3          THE COURT:  What do they do if they don't exactly even

4    know if it exists?  And they're saying, but if it exists, this is

5    where we think it would be.

6          MS. SWIFT:  Well, they haven't told us where they think

7    it would be.  The rule and the case law requires them to identify

8    it by name.  There's case law that says by name or by Bates

9    number.  They have not done that.  If they needed more time to

10   respond to these, they certainly could have asked us.  And if

11   they don't know, they should state that in the interrogatory.

12   They should state we are not aware of any.

13         THE COURT:  The United States incorporates, by

14   reference, the general statements as if fully rewritten.  I love

15   this language.  God, I really don't miss litigation.  I really

16   don't.  The United States further -- overly broad and unduly

17   burdensome.  I agree with them so far.  Every communication.

18   Okay.  United States time period, double-sided always throws me

19   off.

20         MS. SWIFT:  I apologize, Your Honor.

21         THE COURT:  No.  Nope, you didn't know I was going to

22   read it.  Subject to and without waving, the United States

23   answers that pursuant to the parties ongoing discussions

24   regarding scope and breadth of discovery, subject to the parties

25   agreements (indiscernible) period.  The United States agreed to

1    search for and produce certain non-privileged communications

2    between DEA personnel and the burden of deriving or ascertaining

3    by examining (indiscernible) substantially the same.

4              The United States, by reference to federal 33(d) and

5    cites the answer to this interrogatory may be determined by

6    examining DEA records that have been produced or will be

7    produced, including, but not limited to, and then they list

8    specific custodial files.

9              At first blush, I don't know that I've got a problem

10   with that.

11             MS. SWIFT:  Yeah, Your Honor.  I think the problem we

12   have is, first, that's not enough specificity under the rule and

13   under the case law.  Second, we don't have those custodial files.

14   They haven't --

15             THE COURT:  Well, that's a little different.

16             MS. SWIFT:  -- they haven't produced them.

17             THE COURT:  Right.  I don't know exactly what the case

18   law requires, but they are directing you to the custodial files

19   of DEA Diversion investigators who led cyclical inspections.

20   Now, whether that is too broad a category that you don't know who

21   that would be, that's one thing.  They are then directing you to

22   the custodial files of specifically named people.  I don't know.

23             MS. SWIFT:  I think, Your Honor, our problem with this

24   is that we don't want to show up at trial, if there is a trial in

25   this case, and they say we told the Defendants that we had an

1    issue with the dual trigger.  We told them that, or we told them

2    X, Y, or Z.  And we said, wait a second, we asked you to identify

3    that, and you didn't -- you never identified that.  Communication

4    doesn't just mean an email or a record.  I understand that the

5    Government's position is if it happened, it's probably in a

6    document.

7         THE COURT:  And, obviously, if they sought to introduce

8    evidence of that and you showed me a discovery request where you

9    asked for it and they didn't give it to you, I wouldn't let it

10   in.

11        MS. SWIFT:  Well, we appreciate that, Your Honor.  We

12   view this as them not giving us an answer.  I think the

13   Government would probably say this is an answer and therein lies

14   the problem.

15        THE COURT:  I think the bigger problem for you is the

16   Court might say this is an answer.

17        MS. SWIFT:  That is the bigger problem, Your Honor.

18        THE COURT:  Come on.  At some point, folks, here, come

19   on.  We got a lot of stuff.  The Government brought the case, all

20   right.  And, respectfully, you guys have a bigger burden, in my

21   view, to have your ducks in a row.  All right.  But at the same

22   time, you can't cast the net this broadly and expect them to be

23   able to do much with it.

24        MS. SWIFT:  Yeah, I hear you, Your Honor.  I don't

25   think it's that broad.  It's tied specifically to the complaint.

1   To a specific paragraph in the complaint.

2          THE COURT:  Every instance, over how long a period of

3   time?

4          MS. SWIFT:  The dual trigger went into effect, I

5   believe, in 2014 or 2015.

6          THE COURT:  All right.

7          MS. SWIFT:  It would be that through 2022.

8          THE COURT:  Okay.  So eight years.

9          MS. SWIFT:  Yes, Your Honor.

10          THE COURT:  Every instance where anyone in the

11   Government agencies communicated to AmerisourceBergen.  That's

12   pretty broad.  And does AmerisourceBergen have these

13   communications?

14          MS. SWIFT:  We don't think they -- we don't think they

15   have them, Your Honor.  I mean, I think part of this is --

16          THE COURT:  Okay.

17          MS. SWIFT:  -- we're trying to figure out, do they know

18   something that we don't.

19          THE COURT:  Okay.  You don't think they happened?

20          MS. SWIFT:  We don't think they communicated to us

21   about it.

22          THE COURT:  You're asking the Government to produce

23   stuff you don't think exists.  And to the extent it exists, you

24   would have it.

25          MS. SWIFT:  I don't think that's necessarily fair, Your

1   Honor.  We want to know if it exists.  If it exists, we might not

2   necessarily have it.

3          THE COURT:  Do you have any of it?

4          MS. SWIFT:  Not that I have seen, Your Honor.  And it

5   might have happened in a phone call.

6          THE COURT:  Does your client have any of it?

7          MS. SWIFT:  I don't think anybody's seen anything.

8          THE COURT:  Are these documents that they would keep in

9   the ordinary course of their business?  it seems to be pretty

10  important stuff.

11         MS. SWIFT:  To the extent that it was documented.  If

12  it was a phone call that nobody summarized or took notes on --

13         THE COURT:  For Pete's sake, if it was a phone call

14  made by somebody on April 13th, 2017, they're not going to know

15  that.

16         MS. SWIFT:  They may or they may not.

17         THE COURT:  No, they're not.  I just ruled that

18  effectively they are not.  My verdict on this one is for the

19  Government.

20         MS. SWIFT:  Okay.  Thank you, Your Honor.

21         THE COURT:  What's next.

22         MS. SWIFT:  Your Honor, this is as a general matter, we

23  understand this is probably an interrogatory by interrogatory

24  analysis, and I hate to spend too much time on this.

25         THE COURT:  Don't worry, I won't let you.

1          MS. SWIFT:  We do just want to put a marker down that

2     as a general matter, if the Government plans on invoking Rule

3     33(d), they are required to give some specificity, unless Your

4     Honor determines that that specific interrogatory is too broad.

5          THE COURT:  I just looked at one interrogatory --

6          MS. SWIFT:  Exactly.

7          THE COURT:  -- of the group that you pointed me to.  I

8     agree with the Government's objection to that interrogatory.

9          MS. SWIFT:  Yes, Your Honor.

10         THE COURT:  And they're telling me that they can't be

11    more specific than they've been.  If that ends up being not the

12    case, they'll have a lot more problems with me than you will.

13         MS. SWIFT:  Yes, Your Honor.

14         THE COURT:  That's all I can do.  So now identification

15    of AmerisourceBergen's alleged violations.  The Government has

16    yet to provide Defendants with alleged violations despite having

17    the data to do so for nearly eight months.  The alleged

18    violations are the foundation of the Government's case and inform

19    other areas of discovery, including third-party discovery.

20         What is an alleged violation?

21         MS. SWIFT:  So, Your Honor, this case is brought under

22    the Support Act.  Under the Support Act, the Government is

23    alleging that we, the Defendants, failed to report specific

24    suspicious orders.  Each instance is an alleged violation that

25    they have to prove that Defendants are entitled to discovery on

1  each one of those violations.

2          THE COURT:  Understood, and that's what I thought you

3  might say.  But aren't the alleged violations communicated to

4  AmerisourceBergen at the time they're alleged?

5          MS. SWIFT:  We have -- we have received no information

6  from the Government in terms of what specific orders they contend

7  we should have reported as suspicious but did not in the year

8  2022 for AmerisourceBergen?

9          THE COURT:  Just that year.

10          MS. SWIFT:  Just that year, Your Honor.

11          THE COURT:  Why just that year?  Is there -- what makes

12  2022 special?

13          MS. SOHN:  Sure, I can address that, Your Honor.  We

14  provided a preliminary list about a year ago and the simple

15  answer is we did not have data from AmerisourceBergen at the time

16  regarding their orders in 2022.  So we -- obviously, were not

17  able to provide -- I mean, the whole --

18          THE COURT:  Are there any alleged violations for the

19  calendar year 2022?

20          MS. SOHN:  Yes, Your Honor.

21          THE COURT:  Where would documents reflecting those

22  reside?

23          MS. SOHN:  They are residing data that Defendants have

24  produced to the Government, and we have been working on it.

25  Again, this is --

1              THE COURT:  They reside in data that Defendants have

2    produced to the Government.

3              MS. SOHN:  Yes.

4              THE COURT:  That doesn't make a lot of sense.  She's

5    telling -- she's just saying that the answers to what you are

6    seeking are in the data that you gave the Government.

7              MS. SOHN:  Yes, Your Honor.

8              THE COURT:  Does that make sense to you?

9              MS. SWIFT:  Kind of, in a way, Your Honor.  I believe

10   the Government is using what's referred to as Defendants' order

11   monitoring program data, which is data that shows orders that

12   went through Defendants' system -- suspicious order monitoring

13   system to identify specific orders.

14             Our understanding, our belief, is that if we didn't

15   report it to DEA, it wasn't suspicious.  They have taken our data

16   for other years and they have given us -- they've generated a

17   list of here are all the alleged violations.  For 2022, they've

18   had the data to do so for over eight months at this point.

19             THE COURT:  I see what you're saying.  So when are you

20   going to be able to take from their data the violations you

21   allege they committed?

22             MS. SOHN:  We are actively working on it.  We plan --

23   as we've mentioned in our meet and confer conferences, we're

24   actively working on it.  I expect to have it in the next week or

25   two.  Like, we're actively working on it.  There's a lot of data

1    at issue.  There's, unfortunately, you know, machine time, like

2    things that are out of our control and given all the other

3    issues.  You know, it's not something we can just create at the

4    snap of a finger, but we are actively working on it.  You know, I

5    would like --

6                THE COURT:  Two weeks?

7                MS. SOHN:  I think two weeks.  Yeah, that's --

8                THE COURT:  Two weeks it is.  You got two weeks.  All

9    right.  I'll put that in my order.

10               Production of suspicious order data for 2014, 2018.

11   Defendants have repeatedly requested the Government produce 2014,

12   2018 suspicious order data housed by DEA.  The parties have

13   agreed that the relevant time period for discovery is 2014

14   through 2022, though the parties have also agreed there will be

15   some relevant discovery before 2014.  Two, to date, the

16   Government has not agreed to produce this data and has not

17   provided an adequate basis for its refusal.

18               All right.  So, Ms. Sohn, what's going on with this

19   one?

20               MS. DELINE:  Your Honor, I'm happy to address this one.

21   Unless you would like Ms. Swift to start, but I think we have the

22   same timeline.  As we were talking about, we have these sort of

23   two buckets of discovery.  There is customer related discovery,

24   and there is non-customer, sort of all of the other stuff.

25               Back in April of last year, we started negotiating a

1  customer discovery plan.  It has some tiers to it.  Customers

2  fall into different tiers.  What Defendants are going to get for

3  each tier is different.  What we're going to get is different for

4  each tier.  As part of that tiered approach to customer

5  discovery, we, following Your Honor's order on the motion to

6  dismiss -- motion to dismiss, offered to produce this order --

7  this source data, suspicious order report data for 2018 through

8  2022, because those are the violations that remain at issue in

9  this case.

10         THE COURT:  Right.

11         MS. DELINE:  We did that last April, April 2024.  We

12  had then ongoing negotiations about customer discovery for the

13  next 10 months, in which Defendants back and forth, back and

14  forth, agreed that the source data we were producing would be

15  2018 through 2022.  Until February of this year, literally

16  exactly two months ago, they sent an email and said, we would

17  also like the 2014 through 2018 data.

18         As part of our meet and confer and our good faith

19  effort to engage on discovery, we said, okay, we'll take that

20  back.  As you can probably imagine, DEA had a lot of questions

21  about why an --

22         THE COURT:  The data from 2014 to 2018 was first

23  requested from you when?

24         MS. DELINE:  Initially in their RFPs back in 2023, it

25  was in there.  We then came to a customer discovery proposal --

1          THE COURT:  Right.

2          MS. DELINE:  -- that excluded it --

3          THE COURT:  Okay.

4          MS. DELINE:  -- that we were all on the same page

5    about.  Then in February of this year, two months ago, they said,

6    hey, we want the '14 through '18 data.

7          THE COURT:  Okay.

8          MS. DELINE:  We didn't say no.  We said, hey, we

9    previously had this agreement.  We understand why you think it's

10   relevant.  We understand why you want the '14 through '18 data.

11   Let us take it back to DEA.  As you can imagine, DEA was -- had

12   questions about why after 10 months, now they're asking for more

13   data.  We've been working through those questions with DEA.  I,

14   in fact, think that as of this week, we likely can produce this

15   data.  There's some questions and issues to talk to Defendants

16   about and work through.  I think there's some reciprocal

17   modifications we would like to customer discovery plan.  But we

18   have been, for the past two months, talking to DEA to get to a

19   point where we can say, yeah, let's go ahead and produce this

20   data.

21          THE COURT:  And I imagine, Ms. Swift, your position

22   might be, even though we agreed on 2018 to 2022, it was never at

23   the expense of 2014 to 2018, right?

24          MS. SWIFT:  Yes, Your Honor.

25          THE COURT:  Okay.

1          MS. SWIFT:  Yes, Your Honor.  And I actually don't

2    believe that that recitation is 100 percent accurate.  The

3    parties --

4          THE COURT:  That was diplomatic.

5          MS. SWIFT:  Yeah.  The parties were negotiating this

6    customer discovery through December of 2024.  They were

7    negotiating the tier three.  And tier three is where this data

8    showed up.  We had been negotiating it through December.  There

9    was no agreement.  There was no signed anything.  We were

10   negotiating it through December.

11         They finally gave us '18 through 2022 data in January.

12   The parties are currently working through deficiencies in that

13   set of data because there are some and Defendants said in

14   February, a month or two after these tier three negotiations, we

15   would also like the 2014-2018 data.  We had given them our data

16   from that same time period.  Both parties have agreed that the

17   relevant time period is 2014 to 2022, although with an asterisk

18   that there is some relevant information before 2014.

19         The Government, as a third-party, produced this same

20   data from 2006 to 2014 in the cities, counties, and states.

21   Opioid litigation, and they haven't really articulated to us any

22   basis to not produce this in this case.

23         THE COURT:  Meanwhile, you've been receiving and

24   digesting the 2018-2022 stuff, right?

25         MS. SWIFT:  Recently, Your Honor.

1          THE COURT:  Yeah.  Okay.  So how much longer before --

2  will you need before you're able to get them 2014 to 2018?

3          MS. DELINE:  Yeah, I think it actually will take about

4  three weeks to pull, but before -- Your Honor, before

5          THE COURT:  Did you say two?

6          MS. DELINE:  Sorry, about three weeks.

7          THE COURT:  Okay.

8          MS. DELINE:  About three weeks.  DEA often gives us

9  optimistic deadlines, so I would actually probably say four or

10 five just because of how things go.

11         THE COURT:  Well, I'll say three, and you can tell DEA.

12         MS. DELINE:  Okay.  However, Your Honor, I do think

13 there is some -- I agree with Ms. Swift.  We never signed

14 anything.  But our discussions were about '18 through 2022 data

15 onward.

16         THE COURT:  I understand.  I understand.  I understand.

17 It sounds as though we've got a big timeframe.  There was a more

18 specific timeframe prioritized, but there was never an

19 understanding, nor could there have been that the other timeframe

20 was off the table.

21         MS. DELINE:  I'm not sure that I would agree with that.

22         THE COURT:  Right.

23         MS. DELINE:  But some setting that aside, I think there

24 are --

25         THE COURT:  We prioritized 2018 to 2022.

1    MS. DELINE:  Yes.

2    THE COURT:  They just got it in January.  I don't know

3    whether that was unfairly late or took too long.  You say it did.

4    I don't know.  You say it didn't.  Whatever.  They have it.

5    They're digesting it.

6    MS. DELINE:  That's right.

7    THE COURT:  And you'll get them the 2014-2018.

8    MS. DELINE:  Yes, Your Honor, but we would -- I guess

9    we can talk about this in our meet and confer, because I don't

10   think this is something that rises to the level of you having to

11   rule on it, but there are reciprocal edits that we would like to

12   our customer discovery negotiations.  As a result, we're agreeing

13   to give them something that we long ago understood was no longer

14   on the table.

15   So we can talk about it in meet and confers, but I do

16   think that if we're going to produce this data, there's

17   additional, you know, reciprocal changes that we would like on

18   our end.

19   THE COURT:  I understand.  Pace of production.  We've

20   addressed that.  Request for admissions responses.  The

21   Government has largely objected and denied the request based on

22   its objections.  Many of the objections relate to terminology

23   that is well known to the Government, like threshold that the

24   Government uses over 90 times in its own complaint.

25   Do you have an example of one of the -- of that?  And I

1  can trade you your interrogatory --

2      MS. SWIFT:  Sure, Your Honor.  Defendants are still --

3  just for the record, we are still reviewing the RFAs and just

4  determining which ones we would like to move on.

5      THE COURT:  Do you want to withhold discussion on these

6  until you've had the chance to do that?

7      MS. SWIFT:  Yes, Your Honor.  We just got a letter from

8  the Government responding to our letter.

9      THE COURT:  Okay.

10     MS. SWIFT:  So we would appreciate the opportunity to

11  discuss --

12     THE COURT:  Happy to give that to you..  And then the

13  last item would be issues with the Government's privilege logs.

14  Defendants received the Government's first privileged logs in the

15  case last week, although Defendants are still analyzing these

16  logs and the parties will need to meet and confer.  Defendants

17  have already identified issues with these logs.

18     Is that a little premature for me to take up?  It

19  sounds like it, but I'm happy to hear you out.

20     MS. SWIFT:  Yes, Your Honor.  We think it's premature.

21  We just wanted to include it because we do think that's going to

22  be an anticipated dispute throughout discovery.

23     THE COURT:  Okay.  Okay.  Well, look I'll put an order

24  together requiring the identification of the 2022 information by

25  April 2024.  That's two weeks.  Ms. Sohn seemed to think that was

1   okay.

2            The 2014 to 2018, by the end of the month, that's three

3   weeks.  And then the item number one, the list of the individuals

4   by the end of the month as well.  And let's just stay on that

5   pace.

6            Look, this is a -- oh, here.  Liam, could you please

7   get that back to Ms. Swift?

8            THE COURT:  Keep that on you.  That will get lost in my

9   stack of paper, and you'll never know where your notes are.

10           Is there anything else that you would like to discuss

11  while we're together?

12           MS. SWIFT:  Not for Defendants, Your Honor.

13           MR. SCOTT:  Not for.

14           THE COURT:  Okay.  Look, this is a -- look, this is a

15  very big case.  It involves buildings filled with documents and

16  people.  I get it.  The Government.  You know, the Government

17  needs to have its ducks in a row and needs to know what's

18  relevant, and where it is, and get it to the Defendants.  I mean,

19  that's all -- that is what they're entitled to.

20           You've done a lot of work.  Try working faster.  As my

21  wife would tell me, work smarter, not harder.  Be a little more

22  realistic in some of the discovery requests, particularly when

23  they involve documents that either you don't know exist or that

24  if they exist, you would have.

25           MS. SWIFT:  Yes, Your Honor.

1          THE COURT:  All right.  Do I get paid the Special

2    Master fee?  You sure no one else has anything while we're all

3    here together?

4          All right.  You're doing a great job.  I know you're

5    working really hard.  I know it's a lot.  It's litigation.  If

6    you didn't spend half the time being mad at each other, it

7    wouldn't be litigation.

8          Thank you for all your efforts.  Obviously, this is a

9    big case, a big undertaking.  The defense is working hard, and

10   the Government's doing what it has to do.  Quicker, would be

11   better.  And I'm here if you need me.

12         To, I guess, close with the reason for the status

13   conference.  I don't have a party agreeing that a Special Master

14   is necessary.  Based on what I saw here today, this is pretty

15   routine stuff.  I'm happy to deal with it.  I guess, based on my

16   one experience, you'll know if I think you need a Special Master

17   when I just get completely sick of both of you, all right.

18         But look, continue to do what you're doing.  The meet

19   and confer is great.  I know that's a lot of work.  I appreciate

20   it.  I'm not saying this would never be the case for a Special

21   Master, but it seems like it's more a question of where is this

22   stuff and when do we get it?  And hopefully we can work through

23   that.

24         Our current schedule, which I didn't bring with me, has

25   what again, the 25th is the deadline for -- go ahead.

 1              MS. SWIFT:  Document production.

 2              THE COURT:  Document production.  And then what is --

 3    and this is the schedule that you jointly proposed and that we

 4    massaged and put out, right?

 5              MS. SWIFT:  Yes, Your Honor.

 6              THE COURT:  Okay.  What, ma'am, comes after 25th of

 7    July?  What's the next date?

 8              MS. SWIFT:  The next deadline is September 26th, for

 9    any dispute regarding requests for production to be raised with

10    the Court.

11              THE COURT:  Oh, shoot.  We got a lot of time.  And then

12    after that?

13              MS. SWIFT:  After that is fact discovery should be

14    completed by January 9th, 2026.

15              THE COURT:  Okay.

16              THE COURT:  You're doing all right.

17              THE COURT:  You're okay.  You're okay.  I'm sorry

18    you're frustrated.  It hasn't been quicker.  I get it.  But keep

19    going.  I'm here if you need me.

20              MR. SCOTT:  Thank Your Honor.

21              MS. SWIFT:  Thank you, Your Honor.

22              MS. DELINE:  Thank you, Your Honor.

23              THE COURT:  You're welcome.  Thank you.  Have a good

24    weekend.  Good holidays coming up for everybody.

25         (Proceedings concluded at 2:11 p.m.)

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated: April 23, 2025

_____

Jessica B. Cahill, CER/CET-708